Andrew G. Dietderich
John J. Jerome
Michael H. Torkin
Mark U. Schneiderman
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone:    (212) 558-4000
Facsimile:    (212) 558-3588

Proposed Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| EASTMAN KODAK COMPANY, *et al.*,[1] | Case No. 12-_____ (_____) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS**
**AUTHORIZING, BUT NOT DIRECTING, DEBTORS TO (A) PAY CERTAIN**
**PREPETITION WAGES AND REIMBURSABLE EMPLOYEE EXPENSES,**
**(B) PAY AND HONOR EMPLOYEE MEDICAL AND OTHER BENEFITS**
**AND (C) CONTINUE EMPLOYEE BENEFIT PROGRAMS**

Eastman Kodak Company ("**Kodak**"), on behalf of itself and its affiliated debtors

and debtors in possession in these chapter 11 cases (collectively, the "**Debtors**"), hereby submits

this motion (the "**Motion**") for entry of an interim order, substantially in the form attached hereto

as Exhibit A (the "**Proposed Interim Order**"), and a final order, substantially in the form

attached hereto as Exhibit B (the "**Proposed Final Order**"), (i) authorizing, but not directing,

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number, are:  Eastman Kodak Company (7150); Creo Manufacturing America LLC (4412);
Eastman Kodak International Capital Company, Inc. (2341); Far East Development Ltd. (2300); FPC, Inc.
(9183); Kodak (Near East), Inc. (7936); Kodak Americas, Ltd. (6256); Kodak Aviation Leasing LLC
(5224); Kodak Imaging Network, Inc. (4107); Kodak Philippines, Ltd. (7862); Kodak Portuguesa Limited
(9171); Kodak Realty, Inc. (2045); Laser-Pacific Media Corporation (4617); NPEC, Inc. (5677); Pakon,
Inc. (3462); and Qualex, Inc. (6019).  The location of the Debtors' corporate headquarters is:  343 State
Street, Rochester, NY 14650.

the Debtors to (a) pay prepetition wages, salaries, commissions and other compensation, taxes, withholdings and related costs and reimbursable employee expenses as summarized in <u>Appendix I</u> to the Proposed Interim Order, (b) pay and honor obligations relating to employee medical, insurance and other benefits programs and (c) continue their employee medical, insurance and other benefits programs on a postpetition basis, (ii) authorizing, but not directing, financial institutions to receive, process, honor and pay all related checks and electronic payment requests solely to the extent the Debtors have sufficient funds standing to their credit with such financial institutions and (iii) scheduling a final hearing (the "**Final Hearing**") to consider entry of the Proposed Final Order.  In support of this Motion, the Debtors respectfully represent and set forth as follows:

### Background

1.     On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.  No committees have been appointed or designated.

2.     Founded in 1880 and long one of the world's leading material science companies, the Debtors and their non-Debtor affiliates operate an integrated global business involving a diverse collection of mature and growth businesses and an array of valuable intellectual property.  In order to address a shortfall in liquidity in the United States, monetize non-strategic assets, fairly resolve legacy liabilities and focus on their most valuable business lines, the Debtors commenced these chapter 11 cases.

2

3.       Additional factual background relating to the Debtors' businesses and the

commencement of these chapter 11 cases is set forth in detail in the Declaration of Antoinette P.

McCorvey Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of

New York in Support of First Day Pleadings dated January 18, 2012 (the "**First Day**

**Declaration**") filed contemporaneously with this Motion and incorporated herein by reference.

<u>**Facts Specific to the Relief Requested**</u>

A.       **Overview of the Workforce and Employee Obligations**[2]

4.       As of January 9, 2012, the Debtors employed approximately 9,100

employees, of whom approximately 8,000 are full-time employees (including full-time

employees who are on vacation, temporary layoff, leaves of absence, sick leave or short- or long-

term disability) regularly scheduled to work a minimum of 35, 37.5 or 40 hours per week,

depending on location, on a continuing basis and approximately 1,100 are part-time employees

(collectively, the "**Employees**").  The Debtors pay approximately 5,500 of their Employees

(61%) on an hourly basis, while the remaining approximately 3,600 (39%) are paid on a salaried

basis.  None of the Employees are unionized, and none of the Debtors are parties to any

collective bargaining agreement.

5.       In addition to their Employees, the Debtors regularly supplement their

workforce through the use of temporary employees and independent contractors.  On an annual

basis, the Debtors retain (a) approximately 175 to 425 temporary employees, depending on the

---

[2]       Because all the Debtors are organized under the laws of various states in the United States, and because
none of their foreign affiliates are parties to these chapter 11 cases, unless otherwise noted herein, the
Debtors have limited the description of the Workforce and benefits programs to their domestic operations.
Moreover, each of the following Debtors – Kodak Philippines, Ltd., Kodak Portuguesa Limited, Kodak
(Near East), Inc., and Kodak Americas, Ltd. – operates a foreign branch in one or more of the following
jurisdictions: Philippines, Dubai, Turkey, Greece, Peru, Uruguay and Columbia (collectively, the "**Foreign
Branches**").  These Debtors' primary assets consist of the Foreign Branches.  These Debtors intend to
continue their respective employment practices at the Foreign Branches in the ordinary course of business,
consistent with past practice.

3

time of year, through temporary staffing agencies (the "**Staffing Agency Employees**") and (b) approximately 28 independent contractors (the "**Independent Contractors**", and together with the Employees and the Staffing Agency Employees, the "**Workforce**").  In many cases, the Debtors procure the services of the Independent Contractors through individualized contracts that set forth the terms of each Independent Contractor's retention, including remuneration.

6.    The Workforce performs a variety of critical functions, including sales, customer service, information technology, research and development, engineering, purchasing and a variety of administrative, legal, accounting, finance and management-related tasks.  The skills and experience of the Workforce, as well as their relationships with customers and vendors and their knowledge of the Debtors' infrastructure are essential to the Debtors' ongoing operations and ability to effectively reorganize their businesses.

7.    Accordingly, in providing benefits to the Workforce, the Debtors pay and incur a number of obligations (including employee contributions, claims and administrative fees to benefit providers) such as compensation, deductions and payroll taxes, cash incentive programs, equity plans, termination allowance programs, reimbursement expenses, relocation and expatriates expenses, health benefits, workers' compensation benefits, vacation time, life insurance, accidental death and disability benefits, retirement and savings benefits and other benefits that the Debtors have historically provided in the ordinary course of business (collectively, and as more fully described herein, the "**Employee Obligations**").

**B.    Wages, Salaries, Commissions and Other Compensation**

**i.    Unpaid Prepetition Compensation**

8.    In the ordinary course of business, the Debtors pay the majority of their Employees, both hourly and salaried, on a bi-weekly basis, with Employees receiving

4

compensation four days in arrears.[3]  The Debtors' payroll obligations generally include wages,

salaries and overtime compensation, as well as payments related to the Sales and Commissions

Programs described in footnote 6.[4]  On average, the Debtors' gross payroll for the Employees is

approximately $28.6 million per bi-weekly pay period.  The majority of the Debtors' payroll is

made by direct deposit through electronic transfer of funds to the Employees' accounts with the

balance of Employees receiving checks.[5]  During these chapter 11 cases, the Debtors intend to

continue to provide wages, salaries and sales and commissions pay to their Employees in the

ordinary course of business and consistent with historical practice.

9.        As of the Petition Date, the Debtors estimate that they owed

approximately $6 million for approximately 9,100 Employees on account of accrued wages,

---

[3]        The Debtors' payroll includes amounts paid to a small number of U.S.-based employees of non-Debtor
foreign subsidiaries. In 2011, the Debtors paid approximately $330,000 for approximately 3 U.S.-based
employees of non-Debtor foreign subsidiaries. These subsidiaries, from time to time, reimburse the Debtors
through a centralized cash management system.  The Debtors intend to continue this process, including, to
the extent applicable, intercompany reimbursements or loans on account of any payments made by the
Debtors on behalf of such employees (the "**Non-Debtor Compensation Reimbursement**"). The Debtors
seek authority to continue the Non-Debtor Compensation Reimbursement in addition to any relief sought in
any other motion before the Court.

[4]        In addition to their general payroll obligations, the Debtors compensate non-employee members of their
Board of Directors (the "**Director Obligations**").  Historically, each non-employee director received cash,
restricted stock and stock options in a total amount of up to $310,000 per year for services rendered.
During these chapter 11 cases, compensation paid to each non-employee director will be reduced and paid
solely in cash.  In addition, non-employee directors receive varying additional cash compensation for
serving as a committee chair or as the presiding director of the Board of Directors.  As of January 9, 2012,
the Debtors do not believe any prepetition compensation amounts are outstanding on account of the
Director Obligations.

[5]        The Debtors use Wipro Limited ("**Wipro**"), Automatic Data Processing, Inc. ("**ADP**"), KPMG LLP
("**KPMG**") and Pitney Bowes, Inc. ("**Pitney Bowes**") (together, the "**Payroll Providers**") to provide
payroll processing, accounting, tax computation, check preparation, payroll transfer administration and
various administrative services and to fund their payroll in advance.  Specifically, each payroll period, the
Debtors fund certain disbursement accounts with the amounts necessary to satisfy the Debtors' payroll
obligations. The Payroll Providers then process direct deposit transfers or administer payroll checks to
Employees.  The Payroll Providers are also responsible for administering payment of all payroll taxes to
applicable third parties on the Debtors' behalf. The services of the Payroll Providers are crucial to the
smooth functioning of the Debtors' payroll system because they ensure that (a) Employees are paid on
time, (b) source deductions are appropriately determined, (c) payroll reporting is accurate and
(d) appropriate amounts are remitted to taxing authorities and other payees.  The Debtors pay the Payroll
Providers approximately $209,000 per month for their payroll services.  As of January 9, 2012, the Debtors
estimate they owe approximately $100,000 to the Payroll Providers on account of payroll services.

salaries, Non-Debtor Compensation Reimbursement and other cash compensation (excluding reimbursable expenses, severance and vacation pay) that was earned prior to the Petition Date (the "**Unpaid Prepetition Compensation**").[6]

### ii.    Gross Pay Deductions, Governmental Withholdings and Payroll Taxes

10.    For each applicable pay period, the Debtors routinely deduct, directly or through the Payroll Providers, certain amounts from Employee paychecks, including, without limitation, (a) garnishments, child support and service charges and similar deductions and (b) other pre- and after-tax deductions payable pursuant to certain of the employee benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums, contributions under flexible spending plans, 401(k) contributions, legally ordered deductions and miscellaneous deductions) (collectively, the "**Deductions**").  On average, the Debtors deduct a total of approximately $4.7 million from Employees' paychecks per bi-weekly pay period, which the Debtors remit (directly or through the Payroll Providers) to the appropriate third-party recipients.  The Debtors, however, may not have forwarded certain of the Deductions to the appropriate third-party recipients prior to the Petition Date.

---

[6]    In the ordinary course of business, the Debtors provide certain non-insider (as defined in footnote 7) Employees in sales-related positions with compensation pay through various sales and commissions incentive programs (the "**Sales and Commissions Programs**") for, among other things, the achievement of revenue, cost performance, utilization, inventory, sales commission and customer satisfaction goals. Participants in the Sales and Commissions Programs generally do not participate in Kodak's employee incentive programs discussed in Section B.iii, and payments received under the Sales and Commissions Programs range from approximately 17% to 160% of an Employee's base salary.  Therefore, the Sales and Commissions Programs are critical to these Employees' overall compensation.  In general and subject to certain exceptions, payments made under the Sales and Commissions Programs are measured and paid monthly, quarterly, semi-annually or annually, through regular payroll, based upon the achievement of performance metrics that vary by Employee, and may include both individual goals and team goals. Approximately 307 Employees participate in the Sales and Commissions Programs.  As of the Petition Date, the Debtors estimate that they owed approximately $107,000 in earned and approved amounts on account of the Sales and Commissions Programs for the 2011 fiscal year. In addition, in the ordinary course of business, Sales and Commissions Program payments for the 2011 fiscal year with an aggregate target of approximately $4.2 million will be reviewed for payment in February and March 2012. The Debtors are not seeking approval to pay any amounts due in February or March 2012 on account of the Sales and Commissions Programs with entry of the Proposed Interim Order.

11.     In addition to the Deductions, federal and state laws require the Debtors to withhold amounts related to federal, state and local income taxes, Social Security and Medicare taxes for remittance to the appropriate federal, state or local taxing authority (collectively, the "**Withheld Amounts**").  The Debtors must then match the withheld amounts from their own funds for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively, the "**Employer Payroll Taxes**," and together with the Withheld Amounts, the "**Payroll Taxes**").  In the aggregate, the Payroll Taxes, including both the Employee and employer portions, total approximately $8.7 million per bi-weekly pay period.  As of the Petition Date, the Debtors estimate that they owed approximately $600,000 on account of prepetition Payroll Taxes.

### iii.    Employee Incentive Programs

12.     To encourage Employees to maximize their efforts and performance, the Debtors have historically maintained annual incentive programs that bring substantial value to the Debtors' estates by encouraging Employees to achieve company-wide, business segment and/or individual goals and targets.

### a)    Employee Cash Incentive Programs

13.     The Debtors maintained the cash incentive programs described below (collectively, the "**Employee Cash Incentive Programs**") for the fiscal year ended December 31, 2011 and reserve the right to establish Employee Cash Incentive Programs for future performance periods in the ordinary course of business and consistent with historical practice.  In the ordinary course of business, the Debtors determine payments, if any, under the Employee Cash Incentive Programs in the first quarter of the fiscal year based on the achievement of pre-established performance metrics in the prior fiscal year or years.

7

- 2011 Performance Cash Program.  The 2011 Performance Cash Program provides cash incentive awards under the 2005 Omnibus Long-Term Compensation Plan (the "**2005 Omnibus Plan**") for two one-year performance periods, the first of which ended on December 31, 2011 and the second of which will end on December 31, 2012.  The Executive Compensation and Development Committee of the Board of Directors of Kodak (the "**Committee**") sets a target award opportunity for each eligible Employee, with earned amounts based on the level of achievement of pre-established performance metrics.  The Committee establishes the performance metrics for the second performance period within the first 90 calendar days of 2012.  Employees must remain employed through the December 31, 2013 vesting date to be eligible to be paid their awards in 2014, unless they separate from service after December 31, 2011 due to death, disability, retirement, layoff or divestiture.  In the 2011 fiscal year, approximately 272 non-insider[7] Employees and 11 insider Employees participated in the 2011 Performance Cash Program, with an aggregate target cash award of $6.4 million.  **No payments are expected to be earned, and the Debtors do not intend to make any payments, under the program for the 2011 performance period**.[8]

- 2011 U.S. Wage Dividend Plan.  The 2011 U.S. Wage Dividend Plan provides cash payments to eligible hourly Employees who are not already participating in another incentive-based compensation plan.  Employees must remain employed through December 30, 2011 to receive an award.  In the 2011 fiscal year, approximately 4,525 non-insider Employees participated in the 2011 U.S. Wage Dividend Plan, with a target aggregate cash award of $8.1 million.  **No payments are expected to be earned, and the Debtors do not intend to make any payments, under the plan for the 2011 fiscal year**.

- 2011 Global Variable Plan.  The 2011 Global Variable Plan ("**GVP**") provides cash incentive awards to salaried non-executive U.S. Employees who are not already participating in another incentive program, based on the achievement of company, segment and individual performance.  Employees must remain employed through December 30, 2011 to be eligible to receive an award unless they terminate employment due to a divestiture.  In the 2011 fiscal year, approximately 2,850 non-insider Employees participated in the GVP, with a target aggregate cash award of $29.5 million.  **No payments are expected to be earned, and the Debtors do not intend to make any payments, under the plan for the 2011 fiscal year**.

---

[7]    The Debtors' insiders consist of all Employees designated as "officers" for purposes of section 16 of the Securities Exchange Act of 1934 in 2011 and during these chapter 11 cases.

[8]    The Debtors will determine payments, if any, for the 2012 performance period in the first quarter of 2013. The aggregate target cash award for the 2012 performance period is $6.4 million.

SC1:3146918.17

- <u>Executive Compensation for Excellence and Leadership Plan</u>.  The Executive Compensation for Excellence and Leadership Plan ("**EXCEL**") is an annual variable cash plan for senior management that is designed to incent individuals to deliver Debtors' business strategy through cash incentive awards based on the achievement of corporate, segment and strategic product group performance metrics.  Payments are based on results achieved against primary performance metrics, subject to additional Committee discretion considering in part the achievement of baseline metrics that reflect key strategic and operational imperatives for the performance year.  Employees must remain employed through the end of the performance year (*i.e.*, December 31, 2011 for 2011) to receive an award, although they may be eligible for a pro-rata earned award in the event of certain qualifying terminations.  In the 2011 fiscal year, approximately 11 insider Employees and 272 non-insider Employees participated in EXCEL.  **No payments are expected to be earned, and the debtors do not intend to make any payments, under the program for the 2011 fiscal year.**

- <u>Subsidiary-Level Plans</u>.  The Debtors also maintain a number of cash incentive programs for non-insider Employees at certain Kodak subsidiaries - namely:  the 2011 Kodak Imaging Network, Inc. Bonus Plan, the FPC Bonus Plan, the Qualex Inc. Annual Incentive Plan and the Qualex Inc. EIS New Business Group Variable Pay Plan. The Debtors reserve the right to make payments to non-insider Employees under these plans for the 2011 fiscal year based on the achievement of pre-established performance metrics. **No payments are expected to be earned, and the debtors do not intend to make any payments, under the program for the 2011 fiscal year.**

- <u>Other Arrangements</u>.  The Debtors also have entered into individual incentive arrangements with certain non-insider Employees in respect of performance for prior fiscal periods (mostly 2011), which were measured during the first quarter of 2012.[9]  The Debtors reserve the right to make payments thereunder.  As of the Petition Date, the Debtors estimate that they will owe approximately $235,000 in respect thereof.

b)    **Employee Equity Incentive Programs**

14.    The Debtors maintain a number of omnibus incentive plans providing for

the grant of equity awards - namely: the 1995 Omnibus Long Term Compensation Plan, the 1997

---

[9]    Certain insider Employees also are parties to individual incentive arrangements with the Debtors, however, the Debtors are not seeking authority to honor or pay any individual incentive awards for insider Employees at this time.  The Debtors reserve the right to assume these obligations at a later date upon the filing of a separate motion on notice to parties in interest.

SC1:3146918.17

Stock Option Plan, the 2000 Omnibus Long Term Compensation Plan, the 2002 Stock Option

Plan and the 2005 Omnibus Plans (collectively, the "**Equity Plans**").  **The Debtors do not**

**intend to make any grants under these plans during these chapter 11 cases.**[10]

iv.    **Termination Allowance Programs**

15.    Historically, the Debtors have provided termination allowance benefits in

the ordinary course of business to Kodak Employees who are terminated involuntarily in

connection with a layoff, special separation program or divestiture through the Kodak

Termination Allowance Plan ("**TAP**")[11] and maintain various termination allowance plans for

eligible Employees at Kodak's subsidiaries, as well as termination allowance guidelines for non-

insider senior Employees and individual arrangements for certain non-insider Employees[12]

(collectively, the "**Termination Allowance Programs**"). Except to the extent described below,

the Debtors do not believe that they owe any prepetition amounts on account of the Termination

Allowance Programs.

16.    <u>Kodak Termination Allowance Plan</u>.  TAP is a broad-based termination

allowance plan pursuant to which eligible Kodak Employees receive termination allowance

benefits equal to 1.5 weeks of salary (and, as applicable, target cash incentive pay) per year of

service, with a minimum of at least three weeks and a maximum of 52 weeks of termination

---

[10]    To the extent that any equity awards were previously granted under the Equity Plans, the Debtors request the authority in the Proposed Final Order to honor, in the ordinary course of business and consistent with past practice, equity awards granted under the Equity Plans.  However, the Debtors anticipate that any payments with respect to such equity awards will be *de minimis*.

[11]    As described in Section E.v.b below, certain Kodak Employees are eligible to receive termination benefits under the Kodak Retirement Income Plan, a qualified defined benefit plan maintained by the Debtors. These benefits (which constitute the majority of the termination allowance payments for the 2011 fiscal year) are provided in lieu of termination allowance payments under TAP for terminations prior to December 31, 2012 and are paid outside of the Debtors' estates.

[12]    In addition, certain insider Employees are parties to individual arrangements with the Debtors.  By this Motion, the Debtors are not seeking authority to honor or pay any postpetition severance obligations for such Employees pursuant to the individual arrangements at this time.  The Debtors reserve the right to assume these obligations at a later date upon the filing of a separate motion on notice to parties in interest.

10

allowance.  Individual termination allowance amounts vary and depend on the terminated

Employee's salary rate (and, if applicable, target cash incentive pay) and years of service at the

time of termination.  In addition, the Debtors offer outplacement services (the "**Outplacement**

**Services**") to terminated Employees through TAP, including assistance in developing job search

strategies, interviewing skills and resumé writing.  The duration of the Outplacement Services

varies based on the Employee's wage grade at the time of termination, up to a maximum of one

year, and amounts cannot exceed $5,000 for any individual employee.  For the 2011 fiscal year,

outplacement services payments for approximately 280 Employees totaled approximately

$530,000.  As of the Petition Date, the Debtors owed service providers approximately $80,000

on account of Outplacement Services for approximately 80 former employees.  Except with

respect to the Outplacement Services, the Debtors are not requesting authorization to pay any

pre-petition termination allowance benefits under TAP.

17.     Subsidiary-level Termination Allowance Programs.  The Debtors also

maintain a number of termination allowance programs for eligible Employees at certain Kodak

subsidiaries - namely:  the Kodak Subsidiaries' Severance Plan, the Kodak Subsidiaries'

Severance Plan for Employees of FPC, Inc., the Qualex Standard Severance Policy, the Qualex

Enhanced Severance Policy and the Kodak Gallery Employee Severance Practice.  Under the

Kodak Subsidiaries' Severance Plan, eligible Employees at of FPC, Inc. and Qualex Inc. receive

termination allowance benefits as follows: (i) for FPC, Inc., the Kodak Subsidiaries' Severance

Plan for Employees of FPC, Inc. provides eligible Employees with two weeks of salary

continuation for each year of service, with a minimum of two weeks and a maximum of 12

weeks and (ii) for Qualex Inc., the Qualex Standard Severance Policy provides eligible

Employees with outplacement services and two weeks of salary continuation plus one week for

11

each year of service, with a minimum of two weeks and a maximum of 26 weeks, and the Qualex

Enhanced Severance Policy provides certain executives with outplacement services and an

additional two weeks of salary continuation per year of service, up to a maximum of 26

additional weeks.  Under the Kodak Gallery Employee Severance Practice, eligible Employees

are entitled to outplacement services and a half month of salary for each year of service, with a

minimum of two months.  As of the Petition Date, the Debtors owed approximately $110,000 to

four non-insider employees who were terminated prior to the Petition Date, on account of these

subsidiary-level Termination Allowance Programs (the "**Unpaid Subsidiary Termination**

**Obligations**").

> **v.    Protection Plans**

18.    Historically, the Debtors also have provided change in control termination

benefits through the Kodak Employee Protection Plan, the Kodak Executive Protection Plan and

the Subsidiaries' Employee Protection Plan (collectively, the "**Protection Plans**") in the event of

a qualifying termination within two years following a change in control of Kodak.[13]  As of the

Petition Date, there are no prepetition amounts outstanding on account of the Protection Plans.[14]

**C.    Supplemental Workforce Obligations**

> **i.    Temporary Employee Compensation**

19.    When necessary, in the ordinary course of business, the Debtors retain

Staffing Agency Employees who are placed with the Debtors through a number of temporary

staffing agencies ("**Staffing Agencies**") to handle projects or overflow work.  The Debtors

---

[13]    Certain Employee Obligations described elsewhere in this Motion also specify treatment of benefits in the
event of a change in control of Kodak or a qualifying termination in connection with a change in control.

[14]    The Debtors are not seeking authority to honor or continue the Protection Plans at this time.  The Debtors
reserve the right to assume the Protection Plans, or to implement similar plans, at a later date upon the
filing of a separate motion on notice to parties in interest.

SC1:3146918.17

typically remit compensation for the Staffing Agency Employees directly to the Staffing

Agencies on a weekly or bi-weekly basis through the Debtors' accounts payable process (the

"**Staffing Agency Compensation**").  On average, the Debtors pay approximately $2.25 million

per month on account of approximately 175 to 425 Staffing Agency Employees, depending on

the time of year.  As of the Petition Date, the Debtors estimate that they owed Staffing Agencies

approximately $4.8 million for prepetition services provided by Staffing Agency Employees.[15]

### ii.    Independent Contractor Compensation

20.    The Debtors engage annually approximately 28 Independent Contractors

who are vital to the creative content of the Debtors' businesses.  The Independent Contractors

include individuals who provide business and creative services including marketing, strategy,

engineering, development, design and translation.  The Debtors remit compensation to the

Independent Contractors (the "**Independent Contractor Compensation**") through their

accounts payable process.  On average, the Debtors pay a total of approximately $120,000 per

month to Independent Contractors.  As of the Petition Date, the Debtors estimate that they owed

28 Independent Contractors approximately $170,000 in the aggregate for prepetition services.[16]

## D.    Reimbursable Expenses, American Express Corporate Card
## Expenses, Relocation Expenses and Expatriate Employee Expenses

### i.    Reimbursable Expenses

21.    In the ordinary course of business, the Debtors reimburse members of the

Workforce and directors for certain reasonable and customary expenses incurred in the scope of

---

[15]    This request is in addition to any requests related to the Debtors' critical vendors pursuant to the Debtors' Motion for Entry of an Order (A) Authorizing, But Not Directing, Debtors to Pay Certain Prepetition Claims of Critical Vendors and Approving Related Procedures and (B) Authorizing and Directing All Financial Institutions to Honor All Related Payment Requests.

[16]    The Debtors estimate that six  Independent Contractors are owed more than $11,725 on account of Independent Contractor Compensation. The total amount owed to these independent contractors is approximately $90,500, with an aggregate amount of approximately $20,100 in excess of the $11,725 priority cap.

their service and on behalf of the Debtors (collectively, the "**Reimbursable Expenses**"),

including, without limitation, expenses related to (a) business travel, (b) professional

development, (c) business entertainment, (d) communications (*i.e.*, use of mobile communication

devices and internet access for business purposes) and (e) other expenses permitted pursuant to

the Debtors' travel and entertainment policy.  These Reimbursable Expenses are either paid

personally by the Employee or director or charged to an American Express Corporate Card (as

defined herein).

22.    The Debtors process and administer Reimbursable Expenses internally.

Employees input their expenses and supporting documentation into a software management

program, and the expenses are thereafter reviewed by management according to the Debtors'

expense policies.  In an effort to control costs, the Debtors' policies require Employees to adhere

to purchasing, travel and expense guidelines designed to ensure that the Reimbursable Expenses

are reasonable and necessary.

23.    In the aggregate, the Employees and directors incur, on average,

approximately $1,075,000 per pay period in Reimbursable Expenses.  Of this amount,

approximately $125,000 is reimbursed directly to the Employees and directors, and the

remainder is paid to American Express.  Although the Debtors request that Employees and

directors submit reimbursement requests promptly, not all the Employees and directors do so.

Based on historical figures, the Debtors estimate that they owed approximately $250,000  on

account of prepetition Reimbursable Expenses as of the Petition Date, including amounts to be

reimbursed directly to the Employees and to be paid to American Express.

**ii.    American Express Corporate Cards**

24.    To streamline payment of Reimbursable Expenses, the Debtors have

policies whereby American Express issues company credit cards (the "**American Express**

14

**Corporate Cards**") to approximately 3,100 Employees for travel, commuting and certain business-related expenses (the "**American Express Corporate Card Expenses**").  The Debtors have policies whereby their Employees seek reimbursement, or file expense reports for the Debtors' payment, of business-related expenses.  The expenses are ordinary course expenses that Employees incur in performing their job functions.  Included in this category are all expenses incurred on the American Express Corporate Cards.  It is essential to the continued operation of the Debtors' businesses that the Debtors be permitted to continue reimbursing, or making direct payments on behalf of, Employees for such expenses. American Express debits the Debtors' account for the amount due, which is typically approximately $2,100,000 per month.[17]

### iii.    Citibank Purchasing Cards

25.    To streamline certain purchasing expenses, the Debtors have policies whereby Citibank issues company purchasing cards (the "**Citibank Purchasing Cards**") to approximately 450 Employees for various business-related expenses (the "**Citibank Purchasing Card Expenses**"). The Employees file expense reports for the Debtors' direct payment of these expenses, which are ordinary course expenses that Employees incur in performing their job duties. It is essential to the continued operation of the Debtors' businesses that the Debtors be permitted to continue making direct payments on behalf of Employees for Citibank Purchasing Card Expenses. The Debtors pay Citibank approximately $700,000 per month for amounts due on account of the Debtors' Employees and approximately $70,000 per month for amounts due on account of the employees of certain Canadian non-debtor subsidiaries.  Going forward, the Debtors will account for and report separately the amounts related to Debtors' Employees.

---

[17]    Although the Debtors pay invoices for the American Express Corporate Cards, the accounts are held in the names of individual employees and, therefore, to the extent the Debtors fail to remit payment to American Express for valid and legitimate charges, the Employees may be personally liable for the same.

15

      iv.     **Relocation and Expatriate Expenses**

      26.     In the ordinary course of business, the Debtors pay or reimburse Employees for expenses incurred when an Employee relocates at the Debtors' request or for the Debtors' benefit, or for services provided to expatriate Employees ("**Relocation and Expatriate Expenses**"); these payments and reimbursements are processed through a third-party administrator, Mobility Services International ("**MSI**"). Specifically, MSI pays or reimburses Employees for Relocation and Expatriate Expenses, and the Debtors then reimburse MSI for such payments.

      27.     On average, the Debtors typically pay MSI approximately $450,000 per month for Relocation and Expatriate Expenses. As of the Petition Date, the Debtors believe they owed MSI approximately $300,000 on account of Relocation and Expatriate Expenses.

**E.**     **Employee Benefits**

      28.     In the ordinary course of business, the Debtors maintain various employee benefit plans and policies, including, without limitation, health care plans, flexible spending plans, workers' compensation benefits, vacation time and other paid leaves of absence, employee savings and retirement plans, life insurance plans, short- and long-term disability plans, accidental death plans, an adoption assistance program, an employee assistance program, tuition reimbursement programs, a signing and retention program, a special recognition program, a transportation and city allowance program, a patent award program and a military offset program, as described below (collectively, the "**Employee Benefit Programs**").[18] As of January 9, 2012, there were approximately 9,100 Employees, and 31,000 retirees, long-term

---

[18]    Nothing contained in this Motion, the Interim Order or the Final Order constitutes assumption of any of the Employee Benefit Programs. The Debtors expressly reserve their rights to seek to modify or terminate any benefits provided under any agreements in any manner permitted by law, including, as applicable, pursuant to section 1114 of the Bankruptcy Code or otherwise.

disability recipients and survivors participating in the Employee Benefit Programs, as well as

approximately 25,000 dependents of the foregoing who are only eligible to participate in certain

Employee Benefit Programs.

### i.      Health Care Plans

29.      The Debtors provide eligible participants with the medical, dental and

prescription drugs benefits described below (collectively, the "**Health Care Plans**").  As of the

Petition Date, the Debtors provide medical coverage to approximately 7,500 Employees, dental

coverage to approximately 7,600 Employees and prescription drug coverage to approximately

7,500 Employees.  In addition, as of the Petition Date, the Debtors provide medical, dental

and/or prescription coverage to approximately 31,000 retirees, long-term disability recipients and

survivors, as well as approximately 25,000 dependents of participants.  Contributions from the

Debtors may be provided to cover some or all of the coverage costs, depending upon the

participant's status as well as the option and coverage category elected.

- Medical Plan.  The Debtors maintain the Kodak Medical Assistance Plan ("**KMAP**"), which generally offers a choice of a self-insured point-of-service health plan option, a self-insured consumer-directed health plan option,[19] a fully insured preferred provider health plan option (Hawaii only) and a fully insured Medicare Advantage[20] health plan option (collectively, the "**Medical Plan**") to eligible Employees and eligible retirees[21], long-term disability recipients, survivors and dependents.  For the self-insured plan options, the Debtors pay all associated fees and claims costs, net of participant contributions.  For the fully insured plan options, the Debtors pay the insurance premiums, net of participant contributions.  The fully insured plan options also include prescription drug coverage.  In addition, Kodak's subsidiaries may provide health insurance through the Kodak Subsidiaries' Medical Plan.  The Debtors

---

[19]    Participants who elect the consumer-directed health plan have the opportunity to contribute to a Health Savings Account plan on a pre-tax basis.

[20]    The Debtors offer three Medicare Advantage Plans: GoldAnywhere PPO for several New York counties and Vermont, Akamai Advantage Medicare Group Plan 700 PPO for Hawaii and USA Care PPO for the rest of the United States.

[21]    The Debtors also provide medical benefits to certain retirees of a former South African subsidiary.

SC1:3146918.17

pay approximately $10 million per month on account of the Medical Plan and the Kodak Subsidiaries' Medical Plan, net of participant contributions.

- Prescription Plan. The Debtors maintain the self-insured Kodak Prescription Drug Plan ("**KRx**"), which generally offers participants partial coverage of certain prescription drug expenses for participants and their covered dependents (the "**Prescription Plan**"). Coverage is automatic with enrollment in any self-insured option available under the KMAP. The cost of KRx coverage is set by the Debtors each year and is included in the coverage cost of each option available under the KMAP. The cost of the Prescription Plan is included in the $10 million monthly amount paid under the KMAP.

- Dental Plan. The Debtors maintain the self-insured Kodak Dental Plan ("**Kdent**"), which offers coverage of certain dental expenses for participants and their covered dependents, and the self-insured Kodak Dental Assistance Plan ("**KDAP**"), which was closed to new participants in 1993 (collectively, the "**Dental Plans**"). Under Kdent, eligible Employees, retirees, long-term disability recipients, survivors and dependents may choose from two coverage options; certain retirees also continue to receive defined dental benefits under KDAP. Because both plans are self-insured, the Debtors pay all associated fees and claims costs, net of participant contributions. In addition, Kodak's subsidiaries may provide dental and vision insurance through the Kodak Subsidiaries Dental and Vision Plan. The Debtors pay approximately $570,000 per month on account of the Dental Plans and the Kodak Subsidiaries Dental and Vision Plan, net of participant contributions.

30.       Certain prepetition benefits relating to the Health Care Plans were owed but remain unpaid as of the Petition Date, because these obligations have accrued either in whole or in part prior to the Petition Date but will not become payable in the ordinary course of business until a later date. The Debtors estimate that claims and premiums on account of the Health Care Plans average approximately $14.1 million per month.

**ii.       Flexible Benefit Plans**

31.       The Debtors offer eligible Employees the option to participate in the Kodak Flexible Benefits Plan (the "**Flex Plan**"), a "cafeteria plan" that allows participants to

18

purchase certain benefits available through the Kodak Flexible Benefits Program[22] with pre-tax dollars or after-tax dollars.  The Flex Plan provides access to a variety of benefit plans providing medical, dental, income protection, long-term care and other coverage that is available to Employees and other eligible persons under certain terms and conditions.  In addition, the Kodak Subsidiaries' Flexible Benefits Plan,[23] another "cafeteria plan," provides similar benefits to eligible Employees at Kodak's subsidiaries (the "**Subsidiary Flex Plan,**" together with the Flex Plan, the "**Flexible Benefits Plans**").

32.     Currently, approximately 9,100 Employees and 12,000 dependents participate in the Flexible Benefits Plans.  The administration of the Flexible Benefits Plans costs the Debtors approximately $425,000 each quarter.  The Debtors withhold approximately $1.4 million per month on account of participant contributions to the Flexible Benefits Plans.  As of the Petition Date, the Debtors owed approximately $720,000 on account of administrative costs relating to the Flexible Benefits Plans.

**iii.     Workers' Compensation**

33.     The Debtors provide workers' compensation insurance for their Employees at or above the statutorily required levels through a self-insured program (the "**Self-Insured Workers' Compensation Program**") and an insured workers' compensation program through Old Republic Insurance Company (the "**Insured Workers' Compensation Program**").

---

[22]     The pre-tax benefit plans included in the Kodak Flexible Benefits Program are:  KMAP; KRx; Kdent; the Kodak Health Care Reimbursement Account Plan; the Kodak Dependent Care Reimbursement Account Plan; participation in a Health Savings Account; the basic Employee life insurance available through the Kodak Life Insurance Plus Plan; the Kodak Vacation Buy Plan; the Kodak Accidental Death Insurance Plan; the Kodak Dependent Accidental Death Insurance Plan; and the Kodak Long-Term Disability Program.  The after-tax benefit plans included in the Kodak Flexible Benefits Program are:  the optional Employee life insurance available through the Kodak Life Insurance Plus Plan; the Kodak Dependent Life Insurance Plan; and the Kodak Long-Term Care Plan.

[23]     In addition to pre-tax benefit plans, the Kodak Subsidiaries' Flexible Benefits Plans also provide access to a Health Care Spending Account and a Dependent Care Spending Account.

19

The Self-Insured Workers' Compensation Program is limited to Employees of Kodak in New York and Ohio.  The Insured Workers' Compensation Program covers all Employees of Kodak and its subsidiaries in the District of Columbia and all states other than North Dakota (because the Debtors do not report payroll for workers' compensation purposes in North Dakota).  Claim payments for the Self-Insured Workers' Compensation Program average approximately $12 million per year.  For the Insured Workers' Compensation Program, the Debtors' annual insurance premium is $201,706 for the May 1, 2011 to April 30, 2012 policy period.

34.     In addition, in New York and Ohio, the Debtors provide workers' compensation insurance for their Employees in these states in excess of the statutorily required levels because Kodak is self-insured in those states (the "**Excess Workers' Compensation Program**").  For the Excess Workers' Compensation Program, the Debtors' annual insurance premium is $139,114 for the May 1, 2011 to April 30, 2012 policy period.

35.     To ensure that benefits paid to an Employee receiving workers' compensation payments are equal to benefits the Employee would receive under the Short-Term Disability Plan (as described in Section E.vi below) were his or her injury not work-related, the Debtors maintain a Workers' Compensation Supplement Plan (the "**Supplement Plan**," together with the Self-Insured Workers' Compensation Program, Insured Workers' Compensation Program and the Excess Workers' Compensation Program, the "**Workers' Compensation Programs**").  The Supplement Plan provides an Employee with the difference, if any, between workers' compensation payments and the benefits the Employee would otherwise receive under the Short Term Disability Plan.  All costs on account of the Supplement Plan are paid by the Debtors.

20

### iv.    Vacation and Leaves of Absence

36.    <u>Holidays and Vacation Policies</u>.  The Debtors maintain a Holiday Allowance Plan to provide paid time away for seven designated holidays and three floating holidays per year.  Hourly Employees who are required to work on a designated holiday receive a holiday allowance based on their designated schedule, at the rate of double time for hours actually worked.  Salaried Employees who are required to work on a designated holiday may choose an alternate day off with pay.  Employees who terminate employment before a holiday will not be paid for that holiday.

37.    The Debtors also maintain a Vacation Plan that provides from three days to six weeks of paid vacation annually, depending on the Employee's length of service (the "**Vacation Plan**").  Other than for reinstated or newly hired Employees, Employees accrue all of their vacation days in any calendar year on the last scheduled workday of the prior calendar year. Employees who do not use all of their annual vacation days under the Vacation Plan may carry over up to four weeks of the unused portion to the next year.  Employees who terminate employment for any reason receive payment for unused and accrued Vacation Time in their final paycheck.  Additionally, the Debtors operate the Kodak Vacation Buy Plan ("**Vacation Buy**," together with the Vacation Plan, "**Vacation Time**"), which is a component of the Kodak Flexible Benefits Plan.  Vacation Buy permits Employees to purchase an additional four to 40 hours of vacation time through a pre-tax salary reduction.  Vacation Buy hours cannot be carried over from one year to the next, and Employees who have unused hours at the end of a year will receive a cash payment for such unused hours in their final paycheck for such year.

38.    The Employees have accrued approximately $81.5 million on account of unused Vacation Time.  This amount is not, however, a current cash payment obligation, because Employees only are entitled to the cash value of Vacation Time in the event their employment is

SC1:3146918.17

terminated.  As of the Petition Date, the Debtors do not believe that they owe any amounts on account of unused Vacation Time to former Employees.

39.    The Debtors also allow Employees to take various unpaid and paid leaves of absence, including those required by law (collectively, the "**Leaves of Absence**").  Leaves of Absence include personal leave, family and medical leave and military leave.

### v.    Employee Savings and Retirement Plans

40.    The Debtors offer eligible Employees the ability to participate in a number of qualified and non-qualified savings and retirement plans (collectively, the "**Employee Savings and Retirement Plans**").

### a)    Qualified Defined Contribution Plans

41.    <u>Eastman Kodak Employees' Savings and Investment Plan</u>.  The Debtors maintain the Eastman Kodak Employees' Savings and Investment Plan (the "**SIP**"), a qualified defined contribution plan intended to meet the requirements of section 401(k) of the Internal Revenue Code of 1986, as amended (the "**IRC**"), for the benefit of eligible Employees.  The SIP allows for pre-tax salary deductions of eligible compensation up to applicable IRC limits, and certain matching contributions may be provided for eligible Employees who also participate in the KRIP cash balance plan (described below).  All participants are fully vested in their account balances at all times.  The Bank of New York Mellon is the SIP trustee and the Savings and Investment Plan Committee is the SIP administrator.  At the end of the third quarter of 2011, there were approximately 7,700 Employees and 22,000 inactive participants with current account balances in the SIP.  The Debtors match, for eligible Employees, dollar-for-dollar on the first 1% contributed to SIP, and $.50 for each dollar on the next 4% contributed. The approximate bi-weekly amount withheld from such Employees' paychecks for contributions is $2.5 million, and Debtors anticipate making monthly payments of approximately $850,000 on account of

22

participating Employees currently eligible for the matching contributions.  The Debtors estimate

that as of the Petition Date, they had paid all the prepetition matching contributions owed

pursuant to the SIP.

42.    Kodak Subsidiaries' Savings Plan.  The Debtors maintain the Kodak

Subsidiaries' Savings Plan (the "**KSSP**"), a qualified defined contribution plan intended to meet

the requirements of section 401(k) of the IRC, for the benefit of eligible Employees at certain

Kodak subsidiaries.  In addition to allowing for pre-tax salary deductions of eligible

compensation up to applicable IRC limits, certain subsidiaries choose to provide matching

contributions in which eligible Employees become fully vested after seven years of service.

T. Rowe Price Trust Company is the KSSP trustee and the Subsidiaries Committee on Employee

Benefits is the administrator.  There are approximately 28 Employees with current account

balances in the KSSP.  The Debtors match dollar-for-dollar on the first 4% contributed to KSSP.

The approximate bi-weekly amount withheld from such Employees' paychecks for contributions

is $1,900, and Debtors anticipate making bi-weekly payments of approximately $4,000 on

account of participating Employees currently eligible for the matching contributions.  The

Debtors estimate that, as of the Petition Date, they had paid all the prepetition matching

contributions owed pursuant to the KSSP.

43.    Kodak Imaging Network, Inc. 401(k) Salary Savings Plan.  Kodak

Imaging Network, Inc. maintains the Kodak Imaging Network, Inc. 401(k) Salary Savings Plan

(the "**KIN**"), a qualified profit-sharing plan intended to meet the requirements of sections 401(a)

and 401(k) of the IRC, for its eligible Employees.  Eligible Employees may elect to make pre-tax

deductions of eligible compensation up to applicable IRC limits and may receive matching

contributions.  Principal Financial Group is the KIN trustee and the administrator.  There are

approximately 95 participants with current account balances in the KIN. The Debtors match $.25

for each dollar contributed to KIN. The approximate semi-monthly amount withheld from such

Employees' paychecks for contributions is $35,000, and the Debtors anticipate making monthly

payments of approximately $9,000 on account of participating Employees currently eligible for

the matching contributions.  The Debtors estimate that, as of the Petition Date, they had paid all

the prepetition matching contributions owed pursuant to the KIN.

   44. Qualex Inc. 401(k) Plan.  Qualex Inc. maintains the Qualex Inc. 401(k)

Plan (the "**Qualex Plan**"), a defined contribution plan intended to meet the requirements of

section 401(k) of the IRC, for the benefit of its eligible Employees.  Eligible Employees may

make pre-tax deductions of eligible compensation up to applicable IRC limits and may receive

matching employer contributions.  T. Rowe Price Trust Company is the Qualex Plan trustee and

recordkeeper, and Qualex, Inc. is the administrator.  There are approximately 97 Employees with

current account balances in the Qualex Plan.  The Debtors match dollar-for-dollar on the first 4%

contributed to the Qualex Plan, and $.50 for each dollar on the next 2% contributed. The

approximate bi-weekly amount withheld from such Employees' paychecks for contributions is

$19,000, and the Debtors anticipate making monthly payments of approximately $24,000 on

account of participating Employees currently eligible for the matching contributions.  As of the

Petition Date, the Debtors estimate that they had paid all the prepetition matching contributions

owed pursuant to the Qualex Plan.

   45. Laser-Pacific Media Corporation Employees' 401(k)-Retirement Plan.

Laser-Pacific Media Corporation maintains the Laser Pacific Media Corporation Employees'

401(k)-Retirement Plan (the "**Laser-Pacific Plan**"), a qualified prototype profit-sharing plan

intended to meet the requirements of section 401(k) of the IRC, for the benefit of its eligible

24

Employees.  The Debtors do not owe any amounts on account of the Laser-Pacific Plan, although

there are nine former Employees who continue to hold accounts under the Laser-Pacific Plan.

46.    <u>Kodak Employee Stock Ownership Plan</u>.  The Debtors maintain the

Kodak Employee Stock Ownership Plan (the "**KESOP**"), a stock bonus plan intended to meet

the requirements of section 401(a) of the IRC and designed to enable eligible Employees to

accumulate an interest in shares of Kodak common stock through Kodak contributions to the

KESOP, although no Kodak contributions have been made since 1987.  All participants in the

KESOP are 100% vested at all times, and, upon a termination of employment, will receive a plan

distribution after reaching age 70½ or earlier upon request either in a lump sum cash payment or

shares of Kodak common stock.  Kodak sponsors and maintains the KESOP on a trusted and

uninsured basis.  T. Rowe Price Trust Company is the trustee, and the Stock Ownership Plan

Committee is the administrator.  As of January 9, 2012, there are approximately 13,600

participants with account balances under the KESOP.  The Debtors do not intend to make any

contributions to the KESOP during these chapter 11 cases.

**b)    Qualified Defined Benefit Plans**

47.    <u>Kodak Retirement Income Plan</u>.  The Debtors provide retirement benefits

under the Kodak Retirement Income Plan (the "**KRIP**"), a qualified defined benefit plan

intended to meet the requirements of section 414(j) of the IRC and comprised of a traditional

defined benefit pension component and a cash balance component (which covers all new

employees hired after March 31, 1999).  Participants in the defined benefit component receive

benefits upon retirement based on accrued service and average participating compensation.

Participants vest in their accrued benefit after three years of service and may be eligible for

normal retirement (age 65), early retirement (age 55 and at least 10 years of service), vested

benefits or disability retirement benefits depending on the participant's age, disability status and

25

total service when his or her employment ends.  Under the cash balance component, participants receive accrued monthly pay credits and monthly interest credits.  Participants vest in their account balance after three years of service, and benefits are payable on normal retirement (age 65), vested termination or death.  The Bank of New York Mellon is the trustee for KRIP, and the plan administrator is the Kodak Retirement Income Plan Committee ("**KRIPCO**").  As referenced in Section D.iv, footnote 11, the KRIP also provides for the payment of termination benefits in the ordinary course to Employees who are terminated in connection with a layoff, special separation program or divestiture before January 1, 2013.  These termination benefits equal 1.5 weeks of salary (and, as applicable, target cash incentive pay) per year of service, with a minimum of at least three weeks and a maximum of 52 weeks.  These payments are provided in lieu of termination allowance benefits under TAP, although Employees may still be eligible to receive Outplacement Services under TAP.  As of January 9, 2012, approximately 8,500 active Kodak Employees and 46,500 former employees participate in the pension components of the KRIP, which is not part of the Debtors' estates.  The Debtors do not expect that any minimum funding contributions will be necessary with respect to the KRIP in 2012, although they recognize that future minimum funding contributions are dependent upon future valuation results.

48.    <u>Qualex Pension Plan</u>.  Qualex Inc. maintains the Qualex Pension Plan, a qualified defined benefit pension plan intended to meet the requirements of section 414(j) of the IRC for its eligible Employees.  The Qualex Pension Plan has been closed to new members since August 28, 2009, and benefit accruals were frozen on the same date.  Participants receive benefits at retirement based on accrued service and average participating compensation, and are fully vested in their benefits after five years of service.  The Bank of New York Mellon is the

26

trustee and the plan administrator is KRIPCO.  There are approximately 9,000 participants under

the plan and an average monthly obligation of $10,000.  As of January 9, 2012, the Debtors

expect to owe approximately $6 million in minimum funding contributions to this plan in 2012.

49.    Local 966 Pension Plan.  Qualex Inc. was a participating employer in the

Local 966 Pension Plan, which is a qualified, multiemployer defined benefit pension plan.  In

general, upon normal retirement, participants receive monthly benefits based on accrued service

and the employer's monthly contribution rate.  Qualex Inc. withdrew from the Local 966 Pension

Plan in 1997 and currently incurs a quarterly withdrawal liability of approximately  $8,900

through December 1, 2017.  The Debtors do not owe any prepetition amounts on account of the

Local 966 Pension Plan.

### c)    Non-Qualified Plans

50.    Kodak Excess Retirement Income Plan.  The Kodak Excess Retirement

Income Plan (the "**KERIP**") is an excess benefit plan that pays retirement benefits to certain

KRIP-participating Employees whose KRIP benefits are limited by section 415 of the IRC.

Benefits are paid upon retirement out of the general assets of Kodak and are not held in trust,

with KRIPCO acting as the administrator.  There are approximately 290 participants under the

KERIP, none of whom currently are active Employees.  The average monthly KERIP obligation

is approximately $425,000.  **The Debtors are not seeking authority to pay any prepetition**

**amounts on account of, or to continue, the KERIP during these chapter 11 cases.**

51.    Kodak Unfunded Retirement Income Plan.  Kodak maintains the Kodak

Unfunded Retirement Income Plan (the "**KURIP**") to provide benefits to certain KRIP-

participating Employees whose benefits under the SIP and the KRIP (including termination

27

benefits under the KRIP) are limited by section 401(a)(17) of the IRC.[24]  Pension-related benefits are payable out of the general assets of Kodak upon retirement.  The KURIP is administered by KRIPCO, and there are approximately 225 active Employees and 675 former employees participating.  The average monthly KURIP obligation is approximately $1.9 million.  **The Debtors are not requesting the authority to pay any amounts owed to inactive participants under the KURIP.  The Debtors are requesting the authority, but not the direction, to continue to administer the KURIP in the ordinary course of business; *provided*, *however*, that only postpetition accruals for Employees will be earned as administrative expenses, and until further order of the Court, no prepetition KURIP amounts will be paid to any Employees.**

52.    <u>Kodak Company Global Pension Plan for International Employees</u>.  The Kodak Company Global Pension Plan for International Employees (the "**GPP**") is maintained by Kodak for the purpose of providing retirement income benefits to eligible, non-resident alien Employees on Kodak's U.S.-based international payroll who are not eligible to participate in KRIP.  Additionally, the plan governs benefits for Employees who were covered under the Bermuda Plan, a pension plan with a cash balance component, which closed to new enrollment as of March 1, 1999.  Benefits are provided at retirement out of the general assets of Kodak based on accrued pay credits and interest credits earned and service credited while an employee of Kodak.  Since the GPP was established primarily for the benefit of non-resident aliens who are located outside the U.S., it is not subject to title I or title IV of ERISA.  Benefits under GPP are fully vested at all times. There are approximately seven active Employees participating in the

---

[24]    In some cases, non-qualified pension benefits are provided to Employees pursuant to individual arrangements with the Debtors, and not under the KURIP.  For purposes of this motion, references to the KURIP include such individual arrangements.

GPP.  **The Debtors are not asking for the authority to pay any prepetition amounts owed to inactive participants under the GPP. The Debtors are requesting the authority, but not the direction, to continue to administer the GPP in the ordinary course of business;** *provided, however***, that only postpetition accruals for Employees will be earned as administrative expenses, and until further order of the Court, no prepetition GPP amounts will be paid to any Employees.**

53.    1982 Eastman Kodak Company Executive Deferred Compensation Plan. The 1982 Eastman Kodak Company Executive Deferred Compensation Plan (the "**EDCP**") is an unfunded non-qualified deferred compensation plan for eligible Employees of Kodak and certain subsidiaries.  Under the EDCP, eligible Employees are given an opportunity to elect to defer a portion of their compensation for a given year, with any account balance paid in cash following the applicable period of fixed deferment.  The EDCP is administered by the Committee, which froze the ability for Employees to elect to defer monies into the plan in 2009.  **The Debtors are not requesting the authority to pay any prepetition amounts owed to inactive participants on account of the EDCP. The Debtors are requesting the authority, but not the direction, to continue to administer the EDCP in the ordinary course of business;** *provided, however, that only postpetition deferrals will be earned as administrative expenses, and until further order of the Court, no prepetition EDCP amounts will be paid to any Employees.*

54.    Eastman Kodak Deferred Compensation Plan for Directors.  The Eastman Kodak Deferred Compensation Plan for Directors (the "**Directors DCP**") is a non-qualified deferred compensation arrangement for eligible directors on the Board of Directors of Kodak (the "**Board**").  Eligible directors may elect to defer all or a portion of their compensation, whether payable in cash or equity into a phantom stock account under the Directors DCP, and

29

the stock units are distributed in cash following the director's departure. **The Debtors are requesting the authority, but not the direction, to continue to administer the Directors DCP in the ordinary course of business;** *provided, however,* **that only postpetition deferrals will be earned as administrative expenses, and until further order of the Court, no prepetition Directors DCP amounts will be paid to any Directors.**

      vi.    **Life Insurance, Disability Benefits and Accident Benefits**

      55.    The Debtors provide their Employees and eligible retirees with a variety of life insurance, disability and accidental death benefits.

      56.    <u>Life Insurance Benefits</u>.  The Debtors provide their Employees and eligible retirees with life insurance through Metropolitan Life Insurance Company under a number of plans (the "**Life Insurance Benefits**"), including, but not limited to, the following:

- <u>Group Life Insurance with Open Enrollment</u>.  The Debtors provide group term life insurance with open enrollment under the Kodak Life Insurance Plus Plan.  In general, and subject to certain exceptions, enrollment in these plans is open to Employees eligible to participate in the Kodak Flexible Benefits Plan ("**Flex Plan Employees**"), including long-term disability recipients.  Coverage for eligible Employees is either contributory or non-contributory, depending on the age of the participant and coverage election.  Coverage for eligible long-term disability recipients is fully paid through participant contributions.  In the aggregate, the Kodak Life Insurance Plus Plan costs the Debtors approximately $75,000 per month.

- <u>Dependent Life Insurance with Open Enrollment</u>.  The Debtors provide dependent life insurance with open enrollment under the Kodak Life Insurance Plus Plan.  In general, and subject to certain exceptions, enrollment in this plan is open to Flex Plan Employees, Employees on leaves of absence and long-term disability recipients.  Coverage is fully paid for through either payroll deductions or participant contributions.

- <u>Life Insurance with Closed Enrollment</u>.  The Debtors continue to fund six life insurance policies for which enrollment is generally closed:  the Kodak Life Insurance Plan, the Kodak Group Life Insurance Plan, the Kodak Dependent Life Insurance Plan, the Survivor Benefit Insurance Plan, the Family Protection Program and the Supplementary Group Life Insurance Plan.  These plans provide group term life insurance, dependent

30

life insurance, post-retirement survivor income benefits and supplemental life insurance. None of these plans have had new participants since 1993, except for the Kodak Life Insurance Plan which closed in 2001. For participants who are current Employees, coverage is fully provided by the Debtors. In the aggregate, these plans cost the Debtors approximately $4.5 million per month.

- Director Life Insurance. The Debtors provide a $50,000 death benefit for six participants under the Outside Directors Life Insurance policy. This policy was terminated on January 1, 2008, and only provides benefits for directors who retired prior to that date.

- Subsidiary Level Insurance. Kodak's subsidiaries may provide group term life insurance through the Kodak Subsidiaries' Employee Accident and Life Insurance Plan, and dependent life insurance through the Kodak Subsidiaries' Dependent Life Insurance Plan.

57.    Disability Benefits. The Debtors provide their Employees with self-insured disability insurance through a number of plans (the "**Disability Benefits**"), including, but not limited to, the following:

- Short-Term Disability Benefits. The Debtors provide eligible Employees with self-insured, short-term disability benefits through the Kodak Short-Term Disability Plan (the "**STD**"). In general, the STD provides eligible Employees with continuation of all or a portion of their base pay for a period of time when the Employee is absent from work due to disability. Employees are generally covered by the plan beginning on their 61st calendar day of employment, and coverage is fully paid by the Debtors. The monthly cost of the STD is approximately $800,000.

- Long-Term Disability Benefits. The Debtors provide eligible Employees with self-insured, long-term disability benefits through the Kodak Long-Term Disability Plan (the "**LTD**"). In general, the LTD extends disability benefits beyond the period provided by the STD to Employees who are unable to engage in gainful employment due to a prolonged period of disability. Coverage is paid for on either a non-contributory or a contributory basis, depending on the age of the participant and the level of coverage. Payments under the LTD are made from the general assets of the Debtors. The monthly cost of the LTD is approximately $600,000.

- Pilot Benefits. The Debtors provide self-insured disability benefits to eligible pilots employed by the Debtors through the Pilots' Loss of License Disability Plan (the "**Pilot Benefits**"). Generally, pilots who have been disqualified from operating aircraft belonging to the Debtors because they fail to meet the physical requirements for a First-Class Airman

31

Medical Certificate are eligible for Pilot Benefits. The Pilot Benefits are calculated as a percentage of the pilot's salary, and are fully paid by the Debtors. There are currently no pilots receiving a benefit under the Pilot Benefits plan.

- Kodak Pre-Flex Long-Term Disability Plan. The Debtors continue to have funding obligations under the Kodak Pre-Flex Long-Term Disability Plan. The Plan replaces a portion of an eligible Employee's salary during a prolonged period of total disability, and coverage is fully paid by the Debtors. Enrollment in this plan has been closed since 1993. The monthly cost of the plan is approximately $70,000.

- Subsidiary Level Insurance. Kodak's subsidiaries may provide long-term disability benefits through the Kodak Subsidiaries' Long-Term Disability Plan.

58.    Accident Benefits. The Debtors provide their Employees with accidental death insurance through Metropolitan Life Insurance Company under a number of plans (the "**Accident Benefits**"), including, but not limited to, the following:

- Accidental Death Insurance. Employees participating in the Flex Plan are eligible for accidental death insurance under the Kodak Accidental Death Insurance Plan and dependent accidental death or dismemberment insurance under the Kodak Dependent Accidental Death Insurance Plan. Coverage for both plans is fully paid by employees through payroll deductions.

- Occupational Accidental Death Insurance. The Debtors provide all Employees with occupational accidental death insurance through the Kodak Occupational Accidental Death Insurance Plan. The Plan provides a benefit of up to $1,000,000 to surviving dependents of an Employee who dies as the result of an accident arising out of or in the course of the Employee's employment with the Debtors, or while traveling on company business, and is non-contributory. The monthly cost of the plan is approximately $6,300.

- Subsidiary Level Insurance. Kodak's subsidiaries may provide accident insurance through the Kodak Subsidiaries' Employee Accident and Life Insurance Plan.

59.    The Debtors are invoiced for the Life Insurance Benefits, Disability Benefits and Accident Benefits on a monthly basis, and therefore cannot provide a detailed amount of unpaid prepetition amounts related to such benefits at this time. Based on historical

32

figures, however the Debtors estimate that outstanding prepetition amounts related to the Life

Insurance Benefits are approximately $2.8 million, related to the Disability Benefits are

approximately $900,000 and related to the Accident Benefits are approximately $4,000[25].

**vii.    Other Employee Benefit Programs**

60.    The Debtors also maintain the following Employee Benefit Programs:

- Adoption Assistance Program.  The Debtors offer Employees an Adoption Assistance Program that provides up to $2,000 in non-taxable income to cover specific expenses incurred in adopting a child under age 19.  As of the Petition Date, the Debtors do not believe that they owed any prepetition amounts on account of the Adoption Assistance Program.

- Employee Assistance Program.  The Debtors offer an Employee Assistance Program at no cost to Employees.  The Employee Assistance Program offers confidential consultation with professionals for a variety of personal concerns, including stress or depression, job performance, marriage communication, parenting, alcohol or drug abuse and legal or financial issues.  The monthly cost of the Employee Assistance Program is approximately $9,700.  As of the Petition Date, the Debtors do not believe that they owed any prepetition amounts on account of the Employee Assistance Program.

- U.S. Tuition Aid Reimbursement Program.  The Debtors assist certain Employees seeking to pursue a college or graduate-level course of study by reimbursing eligible tuition and expenses.  Reimbursement is subject to specified GPA requirements and must be repaid if the Employee terminates employment or is terminated for gross misconduct prior to two years after completing the course of study.  The annual cost of the U.S. Tuition Aid Reimbursement Program is approximately $55,000.  As of the Petition Date, the Debtors do not believe that they owed any prepetition amounts on account of the U.S. Tuition Aid Reimbursement Program.

- Certified Public Accountant Tuition Reimbursement Program.  The Debtors offer certain Employees reimbursement for fees and course preparation costs necessary to obtain and maintain a Certified Public Accountant license.  As of the Petition Date, the Debtors do not believe

---

[25]    The Debtors will know the actual outstanding prepetition amounts related to the Life Insurance Benefits, Disability Benefits and Accident Benefits upon receipt of their January 2012 invoice. If such amounts are substantially greater than the figures provided in this Motion, the Debtors shall notify (a) the Court; (b) the United States Trustee for the Southern District of New York; (c) counsel to the agent under the proposed Debtor-in-Possession Financing; and (d) counsel to the Ad Hoc Committee of Holders of Senior Secured Notes.

33

that they owed any prepetition amounts on account of the Certified Public Accountant Tuition Reimbursement Program.

- Signing and Retention Program. The Debtors historically have provided signing and retention awards to eligible Employees. The average monthly cost of these awards is approximately $90,000. As of the Petition Date, the Debtors do not believe that they owed any prepetition amounts on account of the Signing and Retention Program.

- Special Recognition Programs. The Debtors historically have provided cash awards to Employees in recognition of extraordinary contributions, project-specific achievements and/or specialized skills, such as contributions to equipment installation or experience with software applications. The average monthly cost of the Special Recognition Programs is approximately $60,000. As of the Petition Date, the Debtors do not believe that they owed any prepetition amounts on account of the Special Recognition Programs.

- Transportation and City Allowance Program. The Debtors provide a Transportation and City Allowance for Employees in certain locations. The monthly cost of the Transportation and City Allowance Program is approximately $35,000. As of the Petition Date, the Debtors do not believe that they owed any prepetition amounts on account of the Transportation and City Allowance Program.

- Patent Award Program. The Debtors provide cash awards to Employees in recognition of key patent filing milestones. The monthly cost of the Patent Award Program is approximately $28,000. As of the Petition Date, the Debtors do not believe that they owed any prepetition amounts on account of the Patent Award Program.

- Military Offset Program. The Debtors provide supplemental cash payments to Employees on military leave to offset the difference between their regular salary with the Debtors and military pay. The annual cost of the Military Offset Program is approximately $6,500. As of the Petition Date, the Debtors do not believe that they owed any prepetition amounts on account of the Military Offset Program.

- Kodak's Employee Political Action Committee ("PAC"). The Debtors maintain both federal and state PAC accounts, which are funded by employee contributions taken through payroll deductions. The balance in the federal PAC account as of the Petition Date is approximately $55,000, and in the state PAC is approximately $7,000. The Debtors will not

SC1:3146918.17

accept employee contributions to, or make payments out o,f the PAC accounts during the pendency of these Chapter 11 cases.[26]

## Jurisdiction

61.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The statutory predicates for the relief requested herein are sections 105(a), 363, 507(a)(4)-(5), 1107(a) and 1108 of the Bankruptcy Code, rule 6003 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and rule 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**").

## Relief Requested

### i.    Proposed Interim Order

62.      The vast majority of the Workforce relies exclusively on their compensation to pay their daily living expenses.  To minimize the personal hardship the Employees would suffer if prepetition employment-related obligations were not paid when due or as expected, and to maintain morale and enhance the Debtors' ability to retain employees during this critical restructuring process, the Debtors seek entry of the Proposed Interim Order, granting the Debtors the authority, to be exercised in their sole discretion, to: (a) pay Unpaid Prepetition Compensation and accrued but unused Vacation Time, not to exceed, in the aggregate, the $11,725 priority cap for any individual Employee; (b) forward prepetition Payroll Taxes and Deductions to the applicable third-party recipients, to the extent that such Payroll Taxes and Deductions have not been forwarded, and to continue forwarding postpetition Payroll

---

[26]      Depending on the speed of processing, it is possible that the January 18, 2011 payroll deductions related to the PAC will not leave the Debtors' accounts until after the Petition Date.

SC1:3146918.17

Taxes and Deductions to the applicable third-party recipients in the ordinary course of business and consistent with past practice; (c) pay 50% of the outstanding prepetition Staffing Agency Compensation; (d) pay any outstanding prepetition amounts to the Payroll Providers; (e) pay prepetition Independent Contractor Compensation not to exceed the $11,725 priority cap for any individual Independent Contractor; (f) pay all Reimbursable Expenses, including American Express Corporate Card Expenses, Citibank Purchasing Card Expenses and Relocation and Expatriate Expenses; (g) pay all prepetition amounts on account of the Employee Benefit Programs other than on account of the KERIP and inactive participants in the KURIP, the GPP, the EDCP and the Directors DCP; and (h) continue the Employee Benefit Programs other than the KERIP, provided that the Debtors only seek to continue the KURIP, the EDCP, the GPP and the Directors DCP for active participants.

63.    The following chart summarizes the immediate relief the Debtors are requesting, which relief is incorporated in the Proposed Interim Order[27]:

| INTERIM ORDER REQUEST[28] | ESTIMATED PARTICIPANTS[29] | ESTIMATED PREPETITION AMOUNTS |
|---|---|---|
| **Wages, Salaries, Commissions and Other Compensation** | | |
| Unpaid Prepetition Compensation[30] | 9,100 | $6,000,000 |

---

[27]    The chart summarizes the Debtors' interim request and is solely for the convenience of the Court and is qualified, in all respects, by the totality of this Motion and the Proposed Interim Order. Nothing contained in this chart constitutes the assumption of any Employee Obligation nor is the chart intended to bind the Debtors with respect to the relief sought herein. The Debtors expressly reserve their rights to seek to modify or terminate any benefits provided under any agreements in any manner permitted by law, including, as applicable, pursuant to section 1114 of the Bankruptcy Code or otherwise.

[28]    The Debtors are not seeking authority to pay (i) $2.4 million of the $4.8 million of prepetition Staffing Agency Compensation, (ii) prepetition amounts on account of Outplacement Services through TAP of $180,000, (iii) Unpaid Subsidiary Termination Obligations at the subsidiary level of $110,000 and (iv) prepetition amounts earned by non-insiders under the individual incentive arrangements of approximately $235,000 until entry of the Proposed Final Order.

[29]    The estimated participants include, and the estimated prepetition amounts as of the Petition Date are on account of, Employees, retirees, long-term disability recipients, survivors and dependents, as applicable.

[30]    No individual Employee will receive more than the $11,725 priority cap under section 507(a)(4) of the Bankruptcy Code (the "**Priority Cap**") in the aggregate on account of Unpaid Prepetition Compensation and prepetition accrued but unused Vacation Time pursuant to the Proposed Interim Order. Employees only

36

| | | |
|---|---|---|
| Payroll Providers | 9,100 | $100,000 |
| Payroll Taxes and Deductions | 9,100 | $600,000 |
| | | |
| **Staffing Agency Compensation** | 175-425 | $4,800,000 |
| **Independent Contractor Compensation**[30] | 28 | $170,000 |
| **Reimbursable Expenses** | 9,100 | $250,000 |
| **Employee Benefits** | | |
| Health Care Plans | 63,600 | $4,400,000 |
| Flexible Benefit Plans | 21,100 | $720,000 |
| Workers' Compensation | 9,100 | —[31] |
| Vacation Time[30] | 9,100 | —[31] |
| Life Insurance Benefits | 35,100 | $2,800,000 |
| Disability Benefits | 10,000 | $900,000 |
| Accident Benefits | 9,100 | $4,000 |
| Certain Employee Savings and Retirement Plans | | |
| SIP | 29,700 | —[31] |
| KSSP | 28 | —[31] |
| KIN | 95 | —[31] |
| Qualex Plan | 97 | —[31] |
| Laser-Pacific Plan | 9 | —[31] |
| KRIP | 55,000 | —[31] |
| Qualex Pension Plan | 9,000 | —[31] |
| Local 966 Pension Plan | — | —[31] |
| Other Employee Benefit Programs | 9,100 | —[31] |

64.    The Debtors also request the right to modify, change and discontinue any

of the Employee Obligations, and the policies related thereto, and to implement new Employee

---

are entitled to accrued and unused Vacation Time upon termination.  No individual Independent Contractor will receive more than the Priority Cap. The Debtors believe that no members of the Workforce are owed amounts exceeding the Priority Cap, not including amounts payable in February or March that are owed under the Sales and Commissions Plans, except for six Independent Contractors, who are owed an aggregate amount of $20,100 in excess of the cap. The Debtors are not requesting the authority to pay any amounts payable in February or March on account of the Sales and Commissions Programs with entry of the Proposed Interim Order. The Debtors request the authority, but not the direction, to pay amounts outstanding to Employees participating in the Sales and Commissions Programs and Independent Contractors, and, out of an abundance of caution, any other amounts in excess of the Priority Cap  to any other members of the Workforce in the Proposed Final Order.

[31]    As of the Petition Date, the Debtors do not believe that they owed any prepetition amounts under this plan or program (or, as applicable, are not aware of any prepetition claims under the plan or program), but out of an abundance of caution request the authority to pay any prepetition amounts that may be outstanding.

37

Obligations in the ordinary course of business during these chapter 11 cases in their sole discretion without the need for further Court approval.

65.     To the extent payments made hereunder are dishonored by the Debtors' financial institutions, the Debtors also request authority for such financial institutions to receive, process, honor and pay any and all replacement checks or wire transfer requests in respect of the relief requested herein.

**ii.     Proposed Final Order**

66.     The Debtors believe that (i) paying prepetition amounts earned by non-insiders under subsidiary-level cash incentive programs and individual incentive arrangements, (ii) continuing the Employee Cash Incentive Programs and Termination Allowance Programs and (iii) paying prepetition amounts to Employees and Independent Contractors in excess of the Priority Cap is critical to maintaining employee morale, retention and performance. The Employee Cash Incentive Programs align Employees' performance with value creation for the estates and the Debtors' creditors. In addition, incentive awards are a significant component of each Employee's total compensation and, without such awards, the Debtors believe that Employees may seek alternative job opportunities, hindering the Debtors' ability to successfully reorganize. The Debtors also believe that it is critical to continue the Termination Allowance Programs, with respect to current Employees, to maintain a stable employment environment, increase morale and promote Employees' continued dedication. In the event that adjustments in the Workforce are unavoidable, the Termination Allowance Programs (including the Outplacement Services) are also crucial to affected Employees who would suffer personal hardship and financial difficulty without these benefits.

67.     Accordingly, at the Final Hearing, the Debtors will seek entry of the Proposed Final Order, granting the Debtors, in addition to the relief requested in the Proposed

38

Interim Order, the authority, to be exercised in their sole discretion, to (a) pay and honor Unpaid

Prepetition Compensation (including amounts owed under the Sales and Commissions Programs)

and accrued but unused Vacation Time in excess of the Priority Cap for applicable Employees;

(b) pay and honor Independent Contractor Compensation (as defined herein) for six independent

contractors in excess of the Priority Cap; (c) pay and honor prepetition amounts owed on account

of Staffing Agency Compensation; (d) pay and honor prepetition amounts earned by non-insiders

under subsidiary-level cash incentive programs and individual incentive arrangements; (e) pay

and honor prepetition amounts pursuant to the Outplacement Services and Unpaid Subsidiary

Termination Obligations; (f) pay and honor obligations and to continue, in the ordinary course of

business and consistent with past practice, the Termination Allowance Programs postpetition; (g)

pay and honor obligations and to continue, in the ordinary course of business and consistent with

past practice, the Employee Cash Incentive Programs and the Equity Plans *provided* that no

payments will be made for performance in the 2011 fiscal year  to the extent described in this

Motion; (h) honor all remaining awards under the Equity Plans; and (i) continue to pay Director

Obligations in the ordinary course of business.

68.    For greater certainty, neither the Proposed Interim Order nor the Proposed

Final Order authorize the Debtors to make any payment or incur any obligation or liability that

would violate section 503(c) of the Bankruptcy Code.

### Basis for Relief

**A.    Sufficient Cause Exists to Authorize the Debtors to Honor Employee Wage and Benefit Obligations.**

**i.    Certain of the Employee Obligations are Entitled to Priority Treatment.**

69.    Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the

majority of Employee Obligations to priority treatment.  As priority claims, the Debtors are

required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims, given priority under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, for (a) "wages, salaries or commissions, including vacation, severance and sick leave pay" earned within 180 days before the Petition Date and (b) contributions to an employee benefit plan arising from services rendered within 180 days before the Petition Date). Given the priority nature of many of the claims the Debtors seek to pay by this Motion, the relief requested herein does not, by and large, impact the amount of the claims to be paid, but only the timing of payment. As such, and given the critical nature of the relief requested, the Debtors submit that the relief requested herein is warranted under the circumstances.

### ii.    Payment of Certain of the Employee Obligations is Required by Law.

70.    The Debtors also seek authority to pay Deductions and Payroll Taxes to the appropriate entities. These amounts principally represent Employee earnings that governments, Employees and judicial authorities have designated for deduction from Employees' paychecks. Indeed, certain Deductions, including contributions to the Employee Benefit Programs and child support and alimony payments, may not be property of the Debtors' estates because they have been withheld from Employees' paychecks on another party's behalf. *See* 11 U.S.C. § 541(b). Further, federal and state laws require the Debtors and their officers to make certain tax payments that have been withheld from their Employees' paychecks. *See* I.R.C. § 6672 and 7501(a); *see also City of Farrell* v. *Sharon Steel Corp.*, 41 F.3d 92, 95-97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *DuCharmes & Co., Inc.* v. *State of Mich. (In re DuCharmes & Co.)*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held

40

personally liable for failure to pay trust fund taxes).  Because the Deductions and Payroll Taxes

are not property of the Debtors' estates, the Debtors request that the Court authorize them to

transmit the Payroll Taxes to the proper parties in the ordinary course of business.

71.     Similarly, pursuant to state law, the Debtors must maintain the Workers'

Compensation Program.  If the Debtors fail to maintain the Workers' Compensation Program,

state law may prohibit them from operating.  Payment of all workers' compensation amounts,

therefore, is crucial to the continued operation of the Debtors' businesses.

### iii.     Applicable Authority Supports the Preplan Payments Requested Herein.

72.     In order to protect against diminution in the value of a debtor's estate and

going-concern enterprise, bankruptcy courts in the Southern District of New York (and

elsewhere) commonly authorize the payment of prepetition obligations in advance of a

confirmed chapter 11 plan ("**Preplan Payments**") in large complex chapter 11 cases.  *In re*

*CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *see also In re Ionosphere Clubs,*

*Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (Preplan Payment of prepetition wages

authorized); *Armstrong World Indus., Inc.* v. *James A. Phillips, Inc.* (*In re James A. Phillips,*

*Inc.*), 29 B.R. 391, 398 (S.D.N.Y. 1983) (Preplan Payment of suppliers' claims authorized).  In

reaching a determination that Preplan Payments are both necessary and appropriate, courts

traditionally have relied on legal theories premised on sections 105(a), 363(b), 1107(a) and 1108

of the Bankruptcy Code.

73.     It is well established that a debtor in possession is a fiduciary for the

bankruptcy estate and, as such, is duty-bound to maximize recoveries for its creditors and, if

justified by the facts and circumstances of its case, holders of its equity interests.  *CoServ,*

*L.L.C.*, 273 B.R. at 497.  In light of this duty, in situations where a debtor can demonstrate a

sound business justification for Preplan Payments, courts have authorized such payments

pursuant to section 363(b) of the Bankruptcy Code. *Ionosphere Clubs*, 98 B.R. at 175 (courts

have "broad flexibility" under section 363(b) of the Bankruptcy Code to permit a debtor to

expend funds outside the ordinary course so long as the debtor articulates a business justification

to do so, including making Preplan Payments).

74.    Section 363(b) of the Bankruptcy Code provides that a debtor in

possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course

of business, property of the estate." 11 U.S.C. § 363(b)(1). A court must find that a "good

business reason" exists prior to authorizing a debtor's use of estate property other than in the

ordinary course of business. *See, e.g., Official Comm. of Unsecured Creditors* v. *Enron Corp.*

*(In re Enron Corp.)*, 335 B.R. 22, 27-28 (S.D.N.Y. 2005) (quoting *In re Lionel Corp.*, 722 F.2d

1063, 1071 (2d Cir. 1983)). In circumstances "where the debtor articulates a reasonable basis for

its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will

generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants*

v. *Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y.

1986). The Debtors respectfully submit that, under the circumstances presented herein, there are

numerous business justifications for granting the requested relief.

75.    In addition to the authority granted under section 363 of the Bankruptcy

Code, bankruptcy courts have granted relief consistent with the Debtors' request herein under the

longstanding "doctrine of necessity" – first articulated in *Miltenberger* v. *Longansport, C. &*

*S.W.R. Co.*, 106 U.S. 286 (1882). Modern application of the doctrine of necessity is derived

from the inherent equitable powers granted to the bankruptcy court under section 105(a) of the

Bankruptcy Code, which empowers the court to "issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). *See*

42

*Schwartz* v. *Aquatic Dev. Group, Inc. (In re Aquatic Dev. Group, Inc.)*, 352 F.3d 671, 680 (2d

Cir. 2003) ("it is axiomatic that bankruptcy courts are 'courts of equity, empowered to invoke

equitable principles to achieve fairness and justice in the reorganization process'") (quoting *In re*

*Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994)).

76.     In situations where Preplan Payments are important to a debtor's

reorganization efforts, bankruptcy courts in this district have permitted such payments under the

doctrine of necessity. *In re Ionosphere Clubs*, 98 B.R. at 175-76 (stating that the authorization of

Preplan Payments is not a novel concept for facilitating a debtor's rehabilitation efforts).

Moreover, some courts have recognized that there are situations that *require* "the preplan

satisfaction of a prepetition claim" in order for the debtor to satisfy its duty to the estate. *CoServ,*

*L.L.C.*, 273 B.R. at 497 (on such occasions "it is only logical that the bankruptcy court be able to

use § 105(a) of the Bankruptcy Code to authorize satisfaction of the prepetition claim in aid of

preservation or enhancement of the estate.").

77.     It is the Debtors' business judgment that payment of outstanding

obligations to their Workforce and related obligations to third parties as requested herein will

result in enhanced creditor recoveries through the preservation of the going-concern value of the

Debtors' estates.  Paying prepetition wages, employee benefits and similar items will benefit the

Debtors' estates and their creditors by allowing the Debtors' business operations to continue

without interruption.  The Debtors believe that without the relief requested herein being granted,

their Employees may seek alternative opportunities, perhaps with the Debtors' competitors.

Such a development would deplete the Workforce, thereby hindering the Debtors' ability to meet

their customer obligations and, likely, diminishing stakeholder confidence in the Debtors' ability

to successfully reorganize.  The Employees perform a variety of critical functions for the

Debtors' businesses and have a wealth of knowledge specific to the Debtors' operations as well as their relationships with customers, vendors and other third parties.  The loss of valuable Employees and resulting recruiting of new personnel that would be necessary to find replacements (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on stabilizing their business operations.  Accordingly, there can be no doubt that the Debtors must do their utmost to retain their Workforce by, among other things, continuing to honor all wage, benefit and related obligations, including the Employee wages and benefits that accrued prepetition.  As such, permitting the Debtors to make Preplan Payments in the amount and manner described herein satisfies "two recognized policies" of chapter 11, namely, maximizing recoveries for a debtor's creditors and preserving the going-concern value of the debtor's enterprise.  *See Bank of Am. Nat'l Trust & Sav. Assoc.* v. *203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999).

78.    Courts in this district historically have granted relief consistent with the Debtors' request on the basis that preplan payment of prepetition obligations to their employees is essential to maximizing recoveries for creditors and preserving a debtor's estate. *See, e.g., In re Hostess Brands,* Case No. 12-22052 (Bankr. S.D.N.Y. Jan. 13, 2012); *In re General Maritime Corp.*, Case No. 11-15285 (Bankr. S.D.N.Y. Dec. 15, 2011); *In re AMR Corp.*, Case No. 11-15463 (Bankr. S.D.N.Y. Nov. 29, 2011); *In re Borders Group, Inc.*, Case No. 11-10614 (Bankr. S.D.N.Y. 2011); *In re Metro-Goldwyn-Mayer Studios, Inc.*, Case No. 10-15774 (Bankr. S.D.N.Y. 2010); *In re Boston Generating, LLC*, Case No. 10-14419 (Bankr. S.D.N.Y. Sep. 23, 2010); *In re The Reader's Digest Association, Inc.*, Case No. 09-23529 (Bankr. S.D.N.Y. 2009); *In re ION Media Networks, Inc.*, Case No. 09-13125 (Bankr. S.D.N.Y. May 21, 2009); *In re Charter Communications, Inc.* Case No. 09-11435 (Bankr. S.D.N.Y. Apr. 15, 2009); *In re*

44

*Chemtura Corp.*, Case No. 09-11233 (Bankr. S.D.N.Y. Apr. 13, 2009); *In re Tronox Inc.*, Case

No. 09-10156 (Bankr. S.D.N.Y. Feb. 6, 2009).  The Debtors submit that the present

circumstances warrant similar relief in these chapter 11 cases.

**B.     Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and
Electronic Fund Transfers.**

79.     Debtors represent that cash reserves, cash flows from operations and

borrowings under the proposed debtor-in-possession financing (the "**DIP Financing**") will be

sufficient to pay postpetition obligations related to the relief requested herein.  Also, under the

Debtors' existing cash management system, the Debtors can readily identify checks or wire

transfer requests as relating to an authorized payment in respect of the obligations to their

Workforce.  Accordingly, the Debtors believe that checks or wire transfer requests, other than

those relating to authorized payments, will not be honored inadvertently and that all applicable

financial institutions should be authorized, when requested by the Debtors, to receive, process,

honor and pay any and all checks or wire transfer requests in respect of the relief requested

herein solely to the extent the Debtors have sufficient funds standing to their credit with such

financial institutions and such financial institution may rely on the representations of such

Debtors as to which checks are issued and authorized or wire transfers are made authorized to be

paid in accordance with this Motion without any duty of further inquiry and without liability for

following the Debtors' instructions.

**Bankruptcy Rule 6003 Is Satisfied.**

80.     In order for a debtor to obtain relief to make Preplan Payments within 21

days of the Petition Date, it must establish that making such payments satisfies the requirements

mandated by Bankruptcy Rule 6003 – namely, the relief requested is necessary to avoid

"immediate and irreparable harm."  If a debtor's prospect of reorganizing is threatened, or swift

SC1:3146918.17

diminution in value of the debtor's estate is likely absent the granting of the requested relief, immediate and irreparable harm likely exists. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (finding that "immediate and irreparable harm" exists where loss of the business threatens ability to reorganize).

81.    As stated herein, paying the prepetition obligations to the Workforce will benefit the Debtors' estates and their creditors by allowing the Debtors' operations to continue without interruption, ensuring the Debtors' continued access to and support of a committed workforce and by reducing both the amount and priority of claims that could be asserted against the Debtors' estates.  Accordingly, the Debtors respectfully submit that they have satisfied Bankruptcy Rule 6003 as it relates to the relief requested herein.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

82.    Given the nature of the relief requested herein, the Debtors respectfully request a waiver of (a) the notice requirements under Bankruptcy Rule 6004(a) and (b) the 14-day stay under Bankruptcy Rule 6004(h).

## Debtors' Reservation of Rights

83.    Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their rights to contest any claim of any member of the Workforce under applicable non-bankruptcy law.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

SC1:3146918.17

## Notice

84.    Notice of this Motion has been provided to: (a) the United States Trustee for the Southern District of New York; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims; (c) the agent under the prepetition revolving credit facility; (d) the indenture trustee for the prepetition 9.2% Senior Notes due June 1, 2021; (e) the indenture trustee for the prepetition 10.625% Senior Secured Notes due March 15, 2019; (f) the indenture trustee for the prepetition 9.95% Senior Notes due July 1, 2018; (g) the indenture trustee for the prepetition 9.75% Senior Secured Notes due March 1, 2018; (h) the indenture trustee for the prepetition 7.00% Convertible Senior Notes due April 1, 2017; (i) the Securities and Exchange Commission; (j) the United States Attorney for the Southern District of New York; (k) the Internal Revenue Service; (l) the Environmental Protection Agency; (m) the Pension Benefit Guaranty Corporation; (n) counsel to KPP Trustees Limited, the trustee of the Kodak Pension Plan; (o) counsel to the Ad Hoc Committee of Holders of Senior Secured Notes; and (p) counsel to the agent under the proposed Debtor-In-Possession Credit Agreement.  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that further notice of this Motion is neither required nor necessary.

## No Prior Request

85.    The Debtors have not previously sought the relief requested herein from this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed

Interim Order and the Proposed Final Order granting the relief requested in the Motion and such

other and further relief as may be just and proper.

Dated:  January 19, 2012
        New York, New York          /s/ Andrew G. Dietderich
                                          Andrew G. Dietderich
                                          John J. Jerome

Andrew G. Dietderich
John J. Jerome
Michael H. Torkin
Mark U. Schneiderman
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:     (212) 558-4000
Facsimile:      (212) 558-3588

- and -
Pauline K. Morgan
Joseph M. Barry
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1270 Avenue of the Americas
Suite 2210
New York, New York  10020
Telephone:     (212) 332-8840
Facsimile:      (212) 332-8855

Proposed Counsel to the Debtors and
Debtors in Possession

## EXHIBIT  A

## Proposed Interim Order

SC1:3146991.14

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| EASTMAN KODAK COMPANY, *et al.*,[1] | ) Case No. 12-_____ (____) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

_____

### INTERIM ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO (A) PAY CERTAIN PREPETITION WAGES AND REIMBURSABLE EMPLOYEE EXPENSES, (B) PAY AND HONOR EMPLOYEE MEDICAL AND OTHER BENEFITS AND (C) CONTINUE EMPLOYEE BENEFITS PROGRAMS

Upon the motion (the "**Motion**")[2] of Eastman Kodak Company ("**Kodak**") on behalf of itself and its affiliates, as affiliated debtors and debtors in possession in these chapter 11 cases (collectively, the "**Debtors**"), for entry of an interim order (the "**Proposed Interim Order**"):  (i) authorizing, but not directing, the Debtors (a) to pay certain prepetition wages, salaries, commissions and other compensation, taxes, withholdings and reimbursable employee expenses, (b) to pay and honor obligations relating to employee medical and other benefits programs and (c) to continue their employee medical and other benefits programs on a postpetition basis; (ii) authorizing, but not directing, financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests related to the foregoing, solely to the extent the Debtors have sufficient funds standing to their credit with such financial institutions; and (iii) scheduling a final hearing (the "**Final Hearing**") to consider entry

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Eastman Kodak Company (7150); Creo Manufacturing America LLC (4412); Eastman Kodak International Capital Company, Inc. (2341); Far East Development Ltd. (2300); FPC Inc. (9183); Kodak (Near East), Inc. (7936); Kodak Americas, Ltd. (6256); Kodak Aviation Leasing LLC (5224); Kodak Imaging Networking, Inc. (4107); Kodak Philippines, Ltd. (7862); Kodak Portuguesa Limited (9171); Kodak Realty, Inc. (2045); Laser-Pacific Media Corporation (4617); NPEC Inc. (5677); Pakon, Inc. (3462); and Qualex Inc. (6019).  The location of the Debtors' corporate headquarters is:  343 State Street, Rochester, NY 14650.

[2]   All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

of the Proposed Final Order; and upon consideration of the First Day Declaration; and it

appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157

and 1334; and it appearing that venue of these chapter 11 cases and the Motion in this district is

proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this matter is a core

proceeding pursuant to 28 U.S.C. § 157(b); and this Court having determined that the relief

requested in the Motion is in the best interests of the Debtors, their estates, their creditors and

other parties in interest; and it appearing that proper and adequate notice of the Motion has been

given and that no other or further notice is necessary; and after due deliberation thereon; and

good and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED as set forth herein.

2.    The Final Hearing shall be held on February [•], 2012 at

_____:_____ a.m./p.m. prevailing Eastern Time.  Any objections or responses to the Motion

shall be filed on or before _____, 2012 at 4:00 p.m. and served on parties in interest as

required by the Local Rules.

3.    Nothing herein shall be deemed to authorize the payment of any amounts

or the incurrence of any obligation that would violate section 503(c) of the Bankruptcy Code.

4.    The Debtors are authorized, but not directed, to pay and honor all

prepetition obligations associated with the Employee Obligations and to continue the Employee

Obligations in the ordinary course of business to the extent requested in the Motion and

summarized in <u>Appendix I</u> and <u>Appendix II</u>; *provided*, *however*, that the Debtors may not pay

(a) any Employee more than $11,725 in the aggregate on account of Unpaid Prepetition

Compensation and prepetition accrued but unused Vacation Time until entry of a Final Order or

(b) any Independent Contractor more than $11,725 on account of Independent Contractor
Compensation, and (c) more than 50% of the outstanding prepetition Staffing Agency
Compensation; *provided further*, *however*, that the Debtors are not authorized to pay and honor
prepetition and postpetition amounts related to the Director Obligations, Employee Cash
Incentive Programs, Equity Plans or Termination Allowance Programs prior to the Final Hearing
and entry of a Final Order approving the same.

5.      The Debtors and any applicable third parties are authorized, but not
directed, to continue to allocate and distribute Deductions and Payroll Taxes to the appropriate
third-party recipients or taxing authorities consistent with the Debtors' stated prepetition policies
and practices.

6.      The Debtors are authorized, but not directed, to continue to honor their
obligations, including any prepetition obligations, to Employees for Reimbursable Expenses,
American Express Corporate Card Expenses, Citibank Purchasing Card Expenses and Relocation
and Expatriate Expenses in accordance with the Debtors' stated policies and prepetition
practices.

7.      The Debtors are authorized, but not directed, to honor the Employee
Benefit Programs to the extent requested in the Motion and to make any necessary contributions
to such programs and pay any unpaid premium, claim or amount owed as of the Petition Date
with respect thereto.

8.      The Debtors are authorized, but not directed, to pay all processing and
administrative fees associated with and all costs and expenses incidental to payment of the
Employee Obligations.

3

9.      Each Debtor that operates a Foreign Branch is authorized, but not directed, to continue its employment practices at such Foreign Branch in the ordinary course of business, consistent with past practice.

10.     Subject to the requested relief sought in the Proposed Final Order, the Debtors are authorized, but not directed, to modify, change and discontinue any of the Employee Obligations, and the policies related thereto, to implement new Employee Obligations and continue to provide compensation to their Employees in the ordinary course of business, each to the extent permitted by applicable law, during these chapter 11 cases in their sole discretion without the need for further Court approval.

11.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

12.     In accordance with this Interim Order (or other order of this Court), each of the financial institutions at which the Debtors maintain their accounts relating to the payment of the obligations described in the Motion is authorized to (a) receive, process, honor and pay all checks presented for payment and to honor all fund transfer requests made by the Debtors related thereto, to the extent that sufficient funds are on deposit in those accounts and (b) accept and rely on all representations made by the Debtors with respect to which checks, drafts, wires or automated clearing house transfers should be honored or dishonored in accordance with this or any other order of this Court, whether such checks, drafts, wires, or transfers are dated prior to, on or subsequent to the Petition Date, and have no duty to inquire otherwise, and shall be without liability for following the Debtors' instructions.  For the avoidance of doubt, all financial institutions are authorized and directed to honor, consistent with the normal course of business, all fund transfers made by the Bank of New York Mellon with respect to funds in the ACH

SC1:3146991.14

prefunding account ending in the digits 8352 (the "**ACH Account**"), and, to the extent that any financial institution receives funds in error, it is ordered to promptly remit such funds to the ACH Account at the Bank of New York Mellon.

13.    Nothing in the Motion or this Order, nor as a result of any payment made pursuant to this Order, shall be deemed or construed as an admission as to the validity or priority of any claim against the Debtors, an approval or assumption of any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code or a waiver of the right of the Debtors, or shall impair the ability of the Debtors, to contest the validity and amount of any payment made pursuant to this Order.

14.    The Debtors shall provide to the agent for the DIP Financing bi-weekly written reports of all payments made hereunder and reasonable and timely access to information sufficient to enable such parties to monitor payments made, obligations satisfied and other actions taken pursuant to this Interim Order.

15.    To the extent that any inconsistency exists between the terms of the interim or final order approving the DIP Financing, if and when entered, and this Order, the terms of the interim or final order approving the DIP Financing, as applicable, shall govern.

16.    The requirements set forth in Local Rule 9013-1(b) are satisfied.

17.    The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.

18.    The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

19.    This Order is successfully effective and enforceable, notwithstanding the possible applicability of Bankruptcy Rule 6004(h) or otherwise.

20.     This Court retains jurisdiction with respect to all matters arising from or
related to the enforcement of this Order.

Dated:  January [•], 2012                          _____
        New York, New York                          United States Bankruptcy Judge

SC1:3146991.14

## Appendix I

The following chart summarizes the Debtors' interim request and is solely for the convenience of the Court and is qualified, in all respects, by the totality of this Motion and the Proposed Interim Order. Nothing contained in this chart constitutes the assumption of any Employee Obligation nor is the chart intended to bind the Debtors with respect to the relief sought herein. The Debtors expressly reserve their rights to seek to modify or terminate any benefits provided under any agreements in any manner permitted by law, including, as applicable, pursuant to section 1114 of the Bankruptcy Code or otherwise.

| INTERIM ORDER REQUEST[1] | ESTIMATED PARTICIPANTS[2] | ESTIMATED PREPETITION AMOUNTS |
|---|---|---|
| **Wages, Salaries, Commissions and Other Compensation** | | |
| Unpaid Prepetition Compensation[3] | 9,100 | $6,000,000 |
| Payroll Providers | 9,100 | $100,000 |
| Payroll Taxes and Deductions | 9,100 | $600,000 |
| | | |
| **Staffing Agency Compensation** | 175-425 | $4,800,000 |
| **Independent Contractor Compensation[3]** | 28 | $170,000 |
| **Reimbursable Expenses** | 9,100 | $250,000 |
| **Employee Benefits** | | |
| Health Care Plans | 63,600 | $4,400,000 |
| Flexible Benefit Plans | 21,100 | $720,000 |

---

[1]    The Debtors are not seeking authority to pay (i) $2.4 million of the $4.8 million of the Staffing Agency Compensation, (ii) prepetition amounts on account of Outplacement Services through TAP of $180,000, (iii) Unpaid Subsidiary Termination Obligations at the subsidiary level of $110,000 and (iv) prepetition amounts earned by non-insiders under the individual incentive arrangements of approximately $235,000 until entry of the Proposed Final Order.

[2]    The estimated participants include, and the estimated prepetition amounts as of January 9, 2012 are on account of, Employees, retirees, long-term disability recipients, survivors and dependents, as applicable.

[3]    No individual Employee will receive more than the $11,725 priority cap under section 507(a)(4) of the Bankruptcy Code (the "**Priority Cap**") in the aggregate on account of Unpaid Prepetition Compensation and prepetition accrued but unused Vacation Time pursuant to the Proposed Interim Order. Employees only are entitled to accrued and unused Vacation Time upon termination. No individual Independent Contractor will receive more than the Priority Cap. The Debtors believe that no members of the Workforce are owed amounts exceeding the Priority Cap, not including amounts payable in February or March that are owed under the Sales and Commissions Plans, except for six Independent Contractors, who are owed an aggregate amount of $20,100 in excess of the cap. The Debtors are not requesting the authority to pay any amounts payable in February or March on account of the Sales and Commissions Programs with entry of the Proposed Interim Order. The Debtors request the authority, but not the direction, to pay amounts outstanding to Employees participating in the Sales and Commissions Programs and Independent Contractors, and, out of an abundance of caution, any other amounts in excess of the Priority Cap to any other members of the Workforce in the Proposed Final Order.

| | | |
|---|---|---|
| Workers' Compensation | 9,100 | —[4] |
| Vacation Time[5] | 9,100 | —[4] |
| Life Insurance Benefits | 35,000 | $2,800,000 |
| Disability Benefits | 10,000 | $900,000 |
| Accident Benefits | 9,100 | $4,000 |
| Certain Employee Savings and Retirement Plans | | |
| SIP | 29,700 | —[4] |
| KSSP | 28 | —[4] |
| KIN | 95 | —[4] |
| Qualex Plan | 97 | —[4] |
| Laser-Pacific Plan | 9 | —[4] |
| KRIP | 55,000 | —[4] |
| Qualex Pension Plan | 9,000 | —[4] |
| Local 966 Pension Plan | — | —[4] |
| Other Employee Benefit Programs | 9,100 | —[4] |

---

[4]    As of the Petition Date, the Debtors do not believe that they owed any prepetition amounts under this plan or program (or, as applicable, are not aware of any prepetition claims under the plan or program), but out of an abundance of caution request the authority to pay any prepetition amounts that may be outstanding.

SC1:3146991.14

**<u>Appendix II</u>**

The Debtors do not intend to and are not seeking authority to pay prepetition amounts on account of, or to continue, the KERIP during these chapter 11 cases.

The Debtors are not seeking authority to pay prepetition amounts on account of, or to continue, the KURIP, the EDCP or the GPP for inactive participants.

The Debtors are seeking authority to continue the KURIP, the EDCP, the GPP and the Directors DCP in the ordinary course of business consistent with historical practice.

The Debtors do not intend to make payments for the 2011 performance period under the Employee Cash Incentive Programs to the extent described in the Motion, but reserve the right to make payments under the Employee Cash Incentive Program for future performance periods.

The Debtors do not intend to make any grants under the Equity Plans during these chapter 11 cases.

**<u>EXHIBIT  B</u>**

**<u>Proposed Final Order</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| EASTMAN KODAK COMPANY *et al.*,[1] | ) | Case No. 12-_____    (_____) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**FINAL ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO**
**(A) PAY CERTAIN PREPETITION WAGES AND REIMBURSABLE EMPLOYEE**
**EXPENSES, (B) PAY AND HONOR EMPLOYEE MEDICAL AND OTHER**
**BENEFITS AND (C) CONTINUE EMPLOYEE BENEFITS PROGRAMS**

Upon the motion (the "**Motion**")[2] of Eastman Kodak Company ("**Kodak**") on

behalf of itself and its affiliated debtors and debtors in possession in these chapter 11 cases

(collectively, the "**Debtors**"), for entry of a final order (the "**Final Order**"):  (i) authorizing, but

not directing, the Debtors (a) to pay certain prepetition wages, salaries, commissions and other

compensation, taxes, withholdings and reimbursable employee expenses, (b) to pay and honor

obligations relating to employee medical, insurance and other benefits programs, (c) to continue

their employee medical, insurance and other benefits programs on a postpetition basis; and

(ii) authorizing, but not directing, financial institutions to receive, process, honor and pay all

checks presented for payment and electronic payment requests related to the foregoing, solely to

the extent the Debtors have sufficient funds standing to their credit with such financial

institutions; and upon consideration of the First Day Declaration; and this Court having entered

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are:  Eastman Kodak Company (7150); Creo Manufacturing America LLC (4412); Eastman Kodak
International Capital Company, Inc. (2341); Far East Development Ltd. (2300); FPC Inc. (9183); Kodak (Near
East), Inc. (7936); Kodak Americas, Ltd. (6256); Kodak Aviation Leasing LLC (5224); Kodak Imaging
Network, Inc. (4107); Kodak Philippines, Ltd. (7862); Kodak Portuguesa Limited (9171); Kodak Realty, Inc.
(2045); Laser-Pacific Media Corporation (4617); NPEC Inc. (5677); Pakon, Inc. (3462); and Qualex Inc.
(6019).  The location of the Debtors' corporate headquarters is:  343 State Street, Rochester, NY 14650.

[2]    All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

an interim order approving the Motion on an interim basis on January [•], 2012 [Docket

No. _____] (the "**Interim Order**"); and it appearing that this Court has jurisdiction to consider

the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of these chapter

11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it

appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court

having determined that the relief requested in the Motion is in the best interests of the Debtors,

their estates, their creditors and other parties in interest; and it appearing that proper and

adequate notice of the Motion has been given and that no other or further notice is necessary; and

after due deliberation thereon; and good and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      Nothing herein shall be deemed to authorize the payment of any amounts

or the incurrence of any obligation that would violate section 503(c) of the Bankruptcy Code.

3.      The Debtors are authorized, but not directed, to pay and honor all

prepetition obligations associated with the Employee Obligations, including any Unpaid

Prepetition Compensation (including any amounts owed under the Sales and Commissions

Programs) and prepetition accrued but unused Vacation Time, Independent Contractor

Compensation, Staffing Agency Compensation, prepetition amounts earned by non-insiders

under the subsidiary-level cash incentive programs and individual arrangements, and

Outplacement Services and Unpaid Subsidiary Termination Obligations, and to continue the

Employee Obligations in the ordinary course of business to the extent requested in the Motion.

SC1:3147870.14

4.      The Debtors are authorized, but not directed, to pay and honor all prepetition obligations associated with the Director Obligations and to continue the Director Obligations in the ordinary course of business to the extent requested in the Motion.

5.      The Debtors and any applicable third parties are authorized to continue to allocate and distribute Deductions and Payroll Taxes to the appropriate third-party recipients or taxing authorities in accordance with the Debtors' stated policies and prepetition practices.

6.      The Debtors are authorized, but not directed, to continue to honor their obligations, including any prepetition obligations to Employees for Reimbursable Expenses, American Express Corporate Card Expenses, Citibank Purchasing Card Expenses and Relocation and Expatriate Expenses in accordance with the Debtors' stated policies and prepetition practices.

7.      The Debtors are authorized, but not directed, to honor the Employee Benefit Programs to the extent requested in the Motion and to make any necessary contributions to such programs and pay any unpaid premium, claim or amount owed as of the Petition Date with respect thereto.

8.      The Debtors are authorized, but not directed, to pay all processing and administrative fees associated with and all costs and expenses incidental to payment of the Employee Obligations.

9.      Each Debtor that operates a Foreign Branch is authorized, but not directed, to continue its employment practices at such Foreign Branch in the ordinary course of business, consistent with past practice.

10.     The Debtors are authorized, but not directed, to maintain and honor, in the ordinary course of business, consistent with the Debtors' prepetition policies and practices and in

3

the Debtors' sole discretion, the Employee Cash Incentive Programs postpetition in accordance

with the Debtors' past practices.  The Debtors shall not award certain prepetition bonuses to

Employees for the 2011 fiscal year to the extent described in the Motion.

11.    The Debtors are authorized, but not directed, to honor all remaining

awards under the Equity Plans.

12.    The Debtors are authorized, but not directed, to maintain and honor, in the

ordinary course of business, in accordance with the Debtors' prepetition policies and practices

and in the Debtors' sole discretion, the Termination Allowance Programs postpetition in

accordance with the Debtors' past practices.

13.    The Debtors are authorized, but not directed, to pay all remaining Unpaid

Termination Obligations to former non-insider employees to the extent described in the Motion.

14.    The Debtors are authorized, but not directed, to modify, change and

discontinue any of the Employee Obligations, and the policies related thereto, to implement new

Employee Obligations and continue to provide compensation to their Employees in the ordinary

course of business during these chapter 11 cases in their sole discretion without the need for

further Court approval.

15.    The Debtors are authorized and empowered to take all actions necessary to

implement the relief granted in this Order.

16.    In accordance with this Order (or other order of this Court), each of the

financial institutions at which the Debtors maintain their accounts relating to the payment of the

obligations described in the Motion is authorized to (a) receive, process, honor and pay all

checks presented for payment and to honor all fund transfer requests made by the Debtors related

thereto, to the extent that sufficient funds are on deposit in those accounts and (b) accept and rely

4

on all representations made by the Debtors with respect to which checks, drafts, wires or automated clearing house transfers should be honored or dishonored in accordance with this or any other order of this Court, whether such checks, drafts, wires, or transfers are dated prior to, on or subsequent to the Petition Date, and have no duty to inquire otherwise, and shall be without liability for following the Debtors' instructions.

17.     Nothing in the Motion or this Order, nor as a result of any payment made pursuant to this Order, shall be deemed or construed as an admission as to the validity or priority of any claim against the Debtors, an approval or assumption of any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code or a waiver of the right of the Debtors, or shall impair the ability of the Debtors, to contest the validity and amount of any payment made pursuant to this Order.

18.     The Debtors shall provide to the agent for the DIP Financing bi-weekly written reports of all payments made hereunder and reasonable and timely access to information sufficient to enable such parties to monitor payments made, obligations satisfied, and other actions taken pursuant to this Final Order.

19.     To the extent that any inconsistency exists between the terms of the interim or final order approving the DIP Financing, if and when entered, and this Order, the terms of the interim or final order approving the DIP Financing, as applicable, shall govern.

20.     The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

21.     This Order is successfully effective and enforceable, notwithstanding the possible applicability of Bankruptcy Rule 6004(h) or otherwise.

SC1:3147870.14

      22.      This Court retains jurisdiction with respect to all matters arising from or related to the enforcement of this Order.

Dated:  February [•], 2012                                 _____
             New York, New York          United States Bankruptcy Judge

SC1:3147870.14