UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |
|---|---|
| In re: | Chapter 11 |
| EASTMAN KODAK COMPANY, *et al.*, | Case No. 12-10202 (ALG) |
| Debtors. | (Jointly Administered) |

---

## MEMORANDUM OF DECISION AND ORDER

A P P E A R A N C E S:

WAYNE GREENWALD, P.C.
*Counsel to Ahsan Zia as Representative
of the Ad Hoc Committee of Equity
Security Holders*
475 Park Avenue South, 26th Floor
New York, New York 10016
  By:  Wayne Greenwald


SULLIVAN & CROMWELL LLP
*Counsel to the Debtors and Debtors in Possession*
125 Broad Street
New York, New York 10004
  By:  Andrew G. Dietderich
       Brian D. Glueckstein
       Michael H. Torkin
       Robert A. Gomez


MILBANK TWEED HADLEY & McCLOY LLP
*Counsel to Official Committee of Unsecured Creditors*
One Chase Manhattan Plaza
New York, New York 10005
  By:  Dennis F. Dunne
       Tyson M. Lomazow
       Brian Kinney
  -and-
1850 K Street N.W., Suite 1100
Washington, D.C. 20006
  By:  David S. Cohen

TRACY HOPE DAVIS
UNITED STATES TRUSTEE
201 Varick Street, Suite 1006
New York, New York 10014
  By:  Brian S. Masumoto
       Michael T. Driscoll

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

## Introduction

Holders of common stock issued by debtor Eastman Kodak Company ("Kodak") have submitted motions, pursuant to § 1102(a)(2) of the Bankruptcy Code, and numerous letters requesting the appointment of an official committee of equity security holders and asserting that the shareholders are not being adequately represented in Kodak's chapter 11 case. After a thorough review of the record, including the evidence and testimony submitted by the parties at an August 5, 2013 hearing, the Court finds that an equity committee is not necessary and that the costs of such a committee would be unreasonable in light of any possible benefits. The motion for a committee is denied, and the decision of the United States Trustee not to appoint such a committee is sustained. Kodak's motions *in limine*, which seek to exclude the testimony of witnesses the Shareholders proffered as experts at the hearing, are granted.

## Background

On January 19, 2012 (the "Petition Date"), Kodak filed for relief under chapter 11. The common stock of Kodak is publicly held, with approximately 270 million shares outstanding. (*See* Exhibit A to Petition, Docket No. 1.) After the Petition Date, a group of Kodak shareholders sent letters to the U.S. Trustee requesting the formation of an official committee of equity security holders. After consideration of extensive information supplied by those shareholders in support of the motion and by Kodak and certain other parties in opposition, the

2

U.S. Trustee denied those shareholders' request on February 29, 2012. The shareholders then filed a motion through counsel seeking the appointment of an official equity committee (Docket No. 545), which was opposed by Kodak, the U.S. Trustee, and the official unsecured creditors' committee (the "Creditors' Committee"). The Court issued a nine-page decision dated June 28, 2012, setting forth its basis for denying the motion. *In re Eastman Kodak Co.,* 2012 WL 2501071 (Bankr. S.D.N.Y. June 28, 2012).

The Kodak chapter 11 case thereafter proceeded to its present point. Kodak exited the dedicated capture devices business and after many months of effort sold its digital imaging patent portfolio for $527 million, far less than the $2.2 to $2.6 billion it had anticipated at the outset of the case. It settled a dispute with its largest creditor, the U.K. Kodak Pension Plan, selling it the personalized imaging and document imaging businesses for $650 million. It prepared a business plan based on the commercial imaging business. It eventually filed an amended plan and disclosure statement that reflected an agreement with its Creditors' Committee and its principal secured creditors that is scheduled to be considered at a confirmation hearing on August 20, 2013.

Since the prior decision denying a motion seeking the formation of an equity committee, different shareholders (the "Shareholders"), acting *pro se*, began to file letters with the Court complaining that they would receive nothing in Kodak's reorganization case and in some cases making charges of malfeasance against Kodak. None of the letters was submitted through a lawyer, but it appears that at least some of these letters were also sent to the U.S. Trustee and sought the appointment of an official committee of equity holders. The record does not show the number of requests that the U.S. Trustee turned down, but there is no question that she turned down the application of the present group and that the U.S. Trustee's decision is entitled to due

3

consideration. *See In re Texaco Inc.*, 79 B.R. 560, 566 (Bankr. S.D.N.Y. 1987); *In re Enron Corp.*, 279 B.R. 671, 684 (Bankr. S.D.N.Y. 2002); 7 *Collier on Bankruptcy* ¶ 1102.07[1] ("While the court is empowered to overrule the decision of the United States trustee not to appoint an additional committee, the court should afford some deference to that decision.").

Shareholder Ahsan Zia then filed the first letter which purported to be a motion (the "Motion") asking the Court to order the appointment of an official equity committee under § 1102(a)(2) of the Bankruptcy Code. (*See* Docket No. 4249.) Shareholder Robert Saikaley joined in the Motion (Docket No. 4407), and Shareholder William Crumley filed a reply to the opposition of the U.S. Trustee and joined in the Motion. (Docket No. 4500.) Various *pro se* Shareholders have submitted informal letters since the filing of the Motion to support the Motion and request an equity committee. In support of the Motion, the Shareholders submitted voluminous documents, as well as documents prepared by two alleged expert witnesses, Maulin V. Shah and Elise Neils.

The Motion was opposed by the Debtors, the U.S. Trustee, and the Creditors' Committee. Kodak also filed *Daubert* motions *in limine* to exclude a significant portion of the documentary evidence as well as all of the expert testimony offered by the Shareholders. *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993). The Court scheduled the motions *in limine* to be heard at the evidentiary hearing. (*See* Docket Nos. 4485, 4555.) In opposition to the Motion, Kodak also submitted declarations from (i) David S. Kurtz, Vice Chairman and Global Head of the Restructuring Group at Lazard Frères & Co. LLC, the Debtors' investment bankers, and (ii) James A. Mesterharm, Managing Director of AlixPartners, LLP and the Debtor's Chief Restructuring Officer. The Creditors' Committee submitted declarations from (i) David Berten, a partner at Global IP Law Group, LLC, and (ii) Robert J. White, a managing director at Jefferies

4

LLC, both of whom are professionals retained by the Creditors' Committee to advise it on economic issues in connection with the case. The Court held a hearing on the Motion on August 5, 2013, with the Shareholders now represented by counsel. It heard live testimony from Maulin V. Shah and Elise Neils, live testimony on cross and redirect from David S. Kurtz, received declarations from David S. Kurtz, James A. Mesterharm, David Berten, and Robert J. White in lieu of testimony, and admitted numerous documents into evidence.

## Discussion

Section 1102(a)(1) of the Bankruptcy Code provides that the U.S. Trustee may appoint an official committee of equity security holders. If the U.S. Trustee does not deem the appointment of such a committee "appropriate," the Court, on request of any party in interest, may order the appointment "if necessary to assure adequate representation of . . . equity security holders." 11 U.S.C. § 1102(a)(2).

As the Court held in denying the 2012 request of shareholders for the appointment of a committee, the cases recognize that the appointment of an equity committee constitutes extraordinary relief and is the exception rather than the rule in chapter 11 cases. *In re Williams Commc'ns Grp., Inc.*, 281 B.R. 216, 223 (Bankr. S.D.N.Y. 2002); *In re Dana Corp.*, 344 B.R. 35, 38 (Bankr. S.D.N.Y. 2006); 7 *Collier on Bankruptcy* ¶ 1102.03[2] (16th ed. rev. 2013). The statute specifically requires a court to find that appointment of an official committee is "necessary" for equity holders' interests to be "adequately represented." The term "necessary" sets a high standard that is more difficult to satisfy than if the statute merely provided that a committee would be useful or appropriate. *In re Oneida Ltd.*, No.06-10489, 2006 WL 1288576, *1 (Bankr. S.D.N.Y. May 4, 2006). With respect to the term "adequate representation," which is not defined by the Code, courts have looked to a number of factors, including the number of

5

shareholders; the complexity of the case; the likely cost of an additional committee to the estate; whether equity is adequately represented by stakeholders already at the table; the timing of the motion relative to the status of the chapter 11 case; and whether there appears to be a substantial likelihood that equity will receive a meaningful distribution in the case. *See, e.g.*, *Williams*, 281 B.R. at 220-21; *In re Leap Wireless Int'l, Inc.*, 295 B.R. 135, 137 (Bankr. S.D. Cal. 2003).

In its decision denying the prior motion for a shareholders' committee, the Court found that the likely cost of an additional committee, the adequacy of existing representatives at the table, and the small probability that shareholders would be entitled to a meaningful distribution all militated against the appointment of a shareholders' committee. It found that the number of shareholders and complexity of the case did not outweigh these factors. In the intervening 13 months, none of these factors has changed in favor of appointment of a committee. Indeed, the factor that considers the timing of the motion weighs against the appointment. Kodak's First Amended Joint Plan of Reorganization is scheduled for a confirmation hearing on August 20, 2013, and the formation of an equity committee would likely result in a substantial delay. The shareholders and their witnesses made it clear that if a committee were appointed, the committee would require weeks, if not months, just to investigate the issues they have purported to raise. This would delay the possibility of any distribution and possibly result in the loss of the Debtors' exit and reorganization financing, to the detriment of Kodak's thousands of creditors, who have a statutory priority over the shareholders.

As noted, the Court found in its prior decision that the record at that time did not indicate that shareholders would be entitled to a meaningful distribution, and that this factor also argued against the appointment of an equity committee. Since then, among other things, the Debtors have filed their First Amended Disclosure Statement, which the Court approved by order entered

6

June 26, 2013 (*see* Docket No. 4167) as containing "adequate information" within the meaning of § 1125 of the Bankruptcy Code. The Disclosure Statement, which is consistent with all of the other information received by the Court throughout the case, demonstrates that the shareholders have even less likelihood of a distribution than they did 13 months ago. The Disclosure Statement contains projections and cash flow forecasts that represent that Kodak's enterprise value as of the plan effective date (in the fall of this year) will be approximately $498 million. (*See* First Amended Disclosure Statement, Docket No. 4143, at p. F-4.) This value will be distributed to parties in interest under the plan of reorganization. Adjusting for payment of administrative, priority and secured claims, the Disclosure Statement estimates the recovery to unsecured creditors at 4-5%, or approximately $70 million, plus other modest consideration. (*Id.* at p. 7.) This is at least $2.4 billion less than the midpoint of aggregated estimated general unsecured claims and retiree settlement unsecured claims against the Debtors. (*See* Kurtz Decl., Docket No. 4504, at ¶ 14.) Thus, in order to demonstrate that there is even a remote possibility of a potential distribution to equity, the Shareholders would have to provide some evidence that the Debtors have understated their expected value upon reorganization by over $2 billion.[1]

The Shareholders who have commenced or have joined in the current motion are apparently convinced that it cannot be possible that the company in which they invested has fallen so far that there is so little value for unsecured creditors and no value at all for shareholders. The Court has received many letters to this effect. As will be seen hereafter, however, the hearing produced no evidence of a value higher than the Debtors have projected or of any likelihood that such value exists.

---

[1] The Debtors' projected value was far higher at the time the prior shareholders' motion for a committee was denied. At that time, the Debtors were maintaining hope that they would be able to sell their digital photography patent portfolio for at least $2 billion. (*See*, *e.g.*, January 18, 2012 Declaration of Michael J. Lasinski, Docket No. 16-3, at ¶ 30.) The ultimate sale price in February 2013 was only $527 million. (*See* First Amended Disclosure Statement, Docket No. 4143, at p. 45.)

In a "Presentation," filed on July 23, 2013 by the Shareholders who joined in the instant Motion, but before they retained counsel, the current movants divided their argument as to the existence of undisclosed value into "three sections." The first asserted that the Debtors will give up $2.6 billion in U.S. net operating losses in connection with their current plan, and that preservation of those losses would "provide substantial 'new value'" to the benefit of all parties in interest. The second asserted that $498 million as set forth in the Disclosure Statement "grossly underestimates the fair market value." The third section asserted that the current "reorganization plan is not fair and equitable" and referred to "potential violations of laws." We start with the argument that the Debtors have grossly underestimated their reorganization value because it was the principal argument they pursued at the hearing.

<u>Alleged "Gross Underestimation of Fair Market Value"</u>

The Shareholders called two witnesses to testify to Kodak's alleged underestimation of fair market value, Maulin V. Shah and Elise Neils. Shah testified as to alleged undisclosed value in Kodak's patent portfolio and Neils as to value in the Kodak brand. Both of these witnesses purported to be experts, and the Debtors filed *Daubert* motions *in limine* to exclude their testimony on multiple grounds. The Court reserved decision on the motions, heard the testimony, and received the reports of the two witnesses. It now finds that the testimony must be excluded as wholly unreliable under applicable law.

*Maulin V. Shah*

Maulin V. Shah is a law graduate who had practiced for a year when, in 2009, he founded his firm called Envision IP, LLC, which is in the business of intellectual property advisory and research services. He testified that he has valued the intellectual property of numerous companies but has never previously testified in court. Whatever the strength of his background,

8

he spent only five hours and his firm spent a total of ten hours on an effort to value the Kodak patents. The firm reported on the results of his work to the Shareholders in a three-page letter dated June 10, 2013 in which he stated, "Based on a discounted cash flow analysis, Envision IP estimates the intrinsic value of Kodak's US patent portfolio to be $1.6 billion to $2.5 billion." (Docket No. 4131-2, at p. 2; Movant's Trial Exh. 5, at p. 2.) The record of the hearing establishes that this opinion is based on assumptions that have no validity whatsoever.

Shah started his analysis on the premise that Kodak has 8,532 U.S. patents in force as of June 2013, and that the average remaining term is 8.177 years. Those figures appear to be rooted in reality.[2] However, for the licensing revenue he said these patents could earn over the next eight years, Shah used a range of $250 to $350 million annual patent revenue. He admitted that this was derived from the amount set forth in the Debtor's "Public Lender Presentation dated January 23, 2012, as well as publicly reported licensing figures published by Kodak in recent years." (*Id.*) Annual patent revenue prior to January 23, 2012 and "in recent years" is at least 18 months out-of-date and includes revenue from Kodak's most valuable digital imaging patents that were sold to a consortium of buyers for more than $500 million in February 2013.

Shah did not change his prediction of future revenues based on the 2013 sale and other recent developments, of which he was aware. He also admitted that he did not consider whether the Debtors had granted licenses to virtually all their retained patents to the consortium involved in the purchase of their digital imaging patent assets or whether the remaining unlicensed patents may be essential to Reorganized Kodak's core businesses and cannot be licensed or sold. Shah's prediction of future revenues on the basis of obviously overstated income assumptions has no

---

[2] The Creditors' Committee's witness on the issue testified by declaration that after the sale transaction with the U.K. Kodak Pension Plan is consummated, Kodak will have approximately 7,000 active patents and 2,300 active patent applications worldwide, with around 4,400 active U.S. patents. (July 31, 2013 Declaration of David Berten, Docket No. 4508, at ¶ 13, p. 7 n.9.)

9

basis in reality. His willingness to state an opinion based on outdated and obviously overstated income figures makes his testimony unreliable.

Expert opinion on the value of patent income streams must be based on facts and data specific to the patents at issue. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1316-17 (Fed. Cir. 2011). An expert cannot base his analysis on "licenses with no relationship to the claimed invention to drive the royalty rate up to unjustified double-digit levels." *Resqnet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010). Since Shah's valuation testimony rests on revenue assumptions that have no support in the facts of record, his testimony must be stricken. *See Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000) (excluding testimony because "the expert must have some reliable basis for extrapolating from the available data"); *Chartwell Litig. Trust v. Addus Healthcare, Inc. (In re Med Diversified, Inc.)*, 346 B.R. 621, 633-34 (Bankr. E.D.N.Y. 2006) (striking testimony on similar grounds).

It must be emphasized that although Shah admitted at the hearing that it would take his firm 5,000 hours to perform a full analysis, he did not take the position that he could not provide any opinion testimony until such an analysis had been performed. For example, in his "Declaration of Maulin Shah Responding to the Debtor's Objection to his Testimony," which was submitted by counsel in response to the *Daubert* motions, he continued to rely on the following fallacious logic: "Envision IP has shown that Kodak has a sizable patent portfolio remaining, and Kodak has stated *in the past* that it has received over $3 billion in licensing revenue. Kodak has not accounted for $2 billion of that licensing revenue. Kodak clearly understands the nature of patent licensing and enforcement, given its track record in the past of obtaining over $3 billion in revenue." (August 2, 2013 Declaration of Maulin V. Shah, Docket

10

No. 4553-1, at ¶ 22) (emphasis added).  Mr. Shah's speculation as to Kodak's past revenues from patent licensing may encourage some shareholders to conclude that Kodak could not conceivably have fallen as far and as fast as it did, but it does not constitute useful or admissible testimony as to the current value of Kodak's estate.  Shah admitted at the hearing that he did not review Kodak's most recent public financial statements, which include a projection of 2013 IP revenue of $35 million, not $350 million.  (*See* July 31, 2013 Declaration of David Berten, Docket No. 4508, at Exh. F, p. 39 (Lender Presentation dated July 15, 2013); Debtor's Hearing Exh. D, at p. 39 (same)).

In their response to the Shareholders' Motion, Kodak and the Creditors' Committee described Kodak's anticipated revenue, including its patent revenue.  On the patent revenue portion, the Creditors' Committee in particular submitted the declaration of its patent expert, David Berten, co-founder and partner of Global IP Group, LLC.  Berten convincingly demonstrates that Shah's conclusions are technically faulty and based on unreliable assumptions, and that the Creditors' Committee did not ignore intellectual property as one element of value in Kodak's asset base.  Berten also avers that the Creditors' Committee supports Kodak's projections of future patent revenues and enterprise value.  Other than the unsupported hypothesis that Kodak, Kodak's professional advisors, the Creditors' Committee, and the Committee's professional advisors are all not to be trusted, the Shareholders provided no reason whatsoever for disregarding Kodak's publicly filed financial statements and projections.

*Elise Neils*

The expert testimony of Elise Neils, a managing director of Brand Finance, must also be excluded under *Daubert*.  Ms. Neils has substantial experience in determining the value of brands and has frequently testified.  However, she or her colleagues spent a grand total of six

11

hours before producing for the Shareholders a "Kodak® Preliminary Brand Valuation" at 3:00 a.m. on July 26, 2013. This document concludes that "under conservative assumptions, it is the opinion of Brand Finance that the value of the Kodak brand under the Relief from Royalty method as of July 25, 2013 is in the range of $400 million to $1 billion." (Docket No. 4546-1, at p. 3; Movant's Trial Exh. 31, at p. 3.)

The Relief from Royalty method is apparently an accepted methodology of attempting to estimate the "proportion of future cash flows that are attributable to the brand – the present value of the post-tax royalties that are held to represent the value of the brand today." (*Id.* at p. 10.)[3] However, Ms. Neils admitted that she did not have the time or information to perform the analysis thoroughly and had little or no information of the type she would ordinarily access in performing a brand valuation. For example, she did not interview Kodak's management or determine the impact of the settlement with the U.K. Kodak Pension Plan, pursuant to which Kodak apparently will grant a perpetual license for its products. Her admitted inability to perform an analysis with the same information she would ordinarily use makes her "preliminary brand valuation" unreliable and excludable. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265-66 (2d Cir. 2002) ("[T]he district court must 'make certain that an expert . . . employs in the courtroom the same level of intellectual rigor the characterizes the practice of an expert in the relevant field.'"), quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).[4]

---

[3] The methodology starts with revenues, assesses brand strength, establishes a range of "similar" royalty rates that the enterprise would have to pay if it did not own the brand, discounts the future revenues, and establishes the net present value of post-tax royalties as the "brand value." (Docket No. 4546-1, at p. 11; Movant's Trial Exh. 31, at p. 11.) Ms. Neils testified that she had performed her analysis of the value of the Kodak brand by starting with Kodak's projection of 2014 revenues of $2.573 billion (*see* First Amended Disclosure Statement dated June 27, 2013, Docket No. 4143, at p. G-13), applying her knowledge as to the cost of licensing similar brands, and then discounting the result to present value.

[4] The only tangible information Ms. Neils reports is that Brand Finance valued the Kodak brand in 2007 as worth $2.995 billion, or 35.1% of a total enterprise value of $8.524 billion; and in 2008 as worth $1.992 billion, or 40.2%

In any event, regardless of the insufficiency of Ms. Neils' report, for purposes of establishing whether shareholders can reasonably expect a meaningful recovery in this case, the exercise is of no use. Even if Ms. Neils had had the opportunity in her six hours of work to learn the basic facts regarding Kodak's present financial situation – and she admitted at the hearing that she did not – she did not dispute that brand value is not a separate item of value in excess of the total equity of an enterprise. Kodak has publicly estimated its equity value upon reorganization as between $208 and $658 million – for an average of $433 million – or, if implied by the rights offering being conducted in connection with the Debtors' plan, as $498 million. (*See* First Amended Disclosure Statement, Docket No. 4143, pp. F-3, F-4 (Valuation of Reorganized Kodak Prepared by Lazard)). Lazard's managing partner, David Kurtz, testified that this valuation was the result of hundreds of hours of work by recognized professionals. Although some shareholders may not accept it, they have not provided any reason to distrust it. They cannot disprove it on the unsupported hypothesis that the Kodak brand might be worth $1 billion, or on the basis that the Kodak brand was worth $1 billion years ago when it was still a leader in the photography business.[5] Whatever value the Kodak brand may have after the sale of its camera business and its bankruptcy, it is imbedded in total equity value, reasonably estimated at less than $500 million and resulting in a wholly insolvent debtor.

In their Presentation, which is referred to above, the Shareholders speculate on numerous other possibilities that Kodak's enterprise value may be much higher than Kodak has disclosed. They speculate that use of certain multiples results in a $3.7 billion reorganization value, that the value of Kodak should be increased by over $3 billion by comparing it to a company named

---

of a total enterprise value of $4.949 billion. (Docket No. 4546-1, at p. 14; Movant's Trial Exh. 31, at p. 14.) Except as evidence of how far Kodak has fallen, or to encourage the Shareholders in their belief that something must be amiss, this data has no probative weight on the issue of current value.

[5] *See supra* n.4.

Graphic Packaging Holding Company, and that insufficient attention has been paid to certain portions of its business going forward. The Shareholders, however, presented no testimony, much less expert testimony, to support their speculation. Moreover, the Creditors' Committee, in opposition to the Shareholders' Motion, submitted the declaration of Robert J. White, a managing director of Jeffries LLC, the Creditors' Committee's investment bankers. The White declaration was admitted as his direct testimony, the Shareholders declined to cross examine him, and his declaration not only refutes the Shareholders' speculations, but also is evidence that the Creditors' Committee has done its job of testing the Debtors' projections and attempting to obtain as much value as possible for Kodak's stakeholders.

As noted above, the Shareholders also focus on two other areas, Kodak's net operating losses and the trading in its debt.

*Net Operating Losses*

The Shareholders argue in their Presentation that the current plan of reorganization "unnecessarily" gives up $2.6 billion in net operating losses ("NOLs") for U.S. tax purposes because the plan would constitute a change of ownership under § 382 of the Internal Revenue Code. They assert that "[p]reserving the tax attributes provides $760 [million] new value and increases the reorganization value to $1.258 [billion]." (Kodak Shareholders' Presentation, Docket No. 4480-2, at p. 2.) The Shareholders do not explain how preserving the tax attributes would increase reorganization value to $1.258 billion (or that they would get a distribution at that level). In order to use NOLs, a reorganized debtor has to have income to offset. Kurtz testified without contradiction that Kodak would not pay taxes in the United States until 2019 under its projections of income, even after loss of the bulk of its NOLs.

In any event, Kurtz also testified that a change of ownership for tax purposes was inevitable and that the creditors, who would benefit before the shareholders from the preservation of all NOLs, recognized this and negotiated for a plan that resulted in an ownership change and a loss of many of the NOLs. Among other things, the creditors were not willing to leave enough equity in the hands of the existing shareholders to avoid the loss of the NOLs. The benefit this would have conveyed to the Shareholders explains why they have placed emphasis on the tax issue, but there is nothing in the Bankruptcy Code that requires the result that they desire. In any event, the tax issue does not support their contention that Kodak is solvent, that they can anticipate a distribution, and that a committee should be formed.

*Trading by Some of the Creditors*

The final portion of the shareholders' presentation is entitled "Reorganization Plan is Not Fair and Equitable and Potential Violations of Laws." The Shareholders here argue that creditors who allegedly own a substantial portion of Kodak's debt bought the debt at a substantial discount and stand to make great profits "by potential insider trading and potential price manipulation of Kodak's unsecured debt and claims. . . ." (*Id.* at p. 5.) Although the Shareholders attach some exhibits that purport to show trading in Kodak's claims, these charges are unsupported. Moreover, the Shareholders do not explain why claims that creditors may have against other creditors for the latter's trading activities would entitle shareholders to a greater recovery. The Shareholders provide no authority for the appointment of an equity committee for the purposes they cite.

## Conclusion

The Court recognizes that if Kodak's current plan is confirmed, its shareholders will lose their entire investment. However, its creditors, who include employees who may have lost their

15

jobs, retirees who worked for Kodak for their entire careers, and small suppliers who may have been dependent on Kodak for their business, will also suffer great losses.  These creditors did not take an investment risk when they contracted with Kodak, and under the Bankruptcy Code they are entitled to recover before the shareholders.

Based on the foregoing, there is no evidence that the Debtor or creditors are hiding value or that an equity committee would be appropriate, much less "necessary" in Kodak's case. The testimony of the Shareholders' two expert witnesses is stricken, and the Motion is denied.

IT IS SO ORDERED.


Dated: August 15, 2013
       New York, New York

*/s/ Allan L. Gropper*
UNITED STATES BANKRUPTCY JUDGE